JEFFER MANGELS & MITCHELL LLP
THOMAS M. GEHER (Bar No. 130588)
*TGeher@jeffer.com*
1900 Avenue of the Stars, 7th Floor
Los Angeles, CA 90067
Telephone: (310) 203-8080
Facsimile: (310) 203-0567

JEFFER MANGELS & MITCHELL LLP
JON A. WEININGER (Bar No. 216744)
*jweininger@jeffer.com*
3 Park Plaza, Suite 1100
Irvine, California 92614-2592
Telephone: (949) 623-7200
Facsimile: (949) 623-7202

Attorneys for Plaintiff MIGHTY TITANS LLC

**UNITED STATES BANKRUPTCY COURT**

**CENTRAL DISTRICT OF CALIFORNIA**

**LOS ANGELES DIVISION**

In re

ALLSTATE LENDING GROUP, INC., *et al.*

Debtors,

MIGHTY TITANS LLC, a California limited liability company,

Plaintiff,

v.

ALLSTATE LENDING GROUP, INC., a California corporation; ALLSTATE LENDING GROUP SERVICING, LLC, a California limited liability company; TRMY INC., a Wyoming corporation; JORDAN ROSEN, an individual; ALISA ABECASSIS, individually and as TRUSTEE OF THE ALISA ABECASSIS REVOCABLE TRUST DATED APRIL 14, 2004; C FAMILY INVESTMENTS, LLC, a California limited liability company; MICHAEL C. VERNICK, individually and as TRUSTEE OF THE MCV INVESTMENTS DEFINED BENEFIT PLAN and TRUSTEE OF THE VERNICK FAMILY TRUST U/A

Case No. 2:26-bk-11879- NB

Chapter 11

Jointly Administered With:
Case No. 2:26-bk-11882-NB

**COMPLAINT OF PLAINTIFF MIGHTY TITANS LLC FOR:**

1. **QUIET TITLE;**
2. **CANCELLATION OF INSTRUMENTS;**
3. **DECLARATORY RELIEF;**
4. **ACCOUNTING; AND**
5. **SLANDER OF TITLE**

DECEMBER 29, 1983; LINDA R. VERNICK, individually and as TRUSTEE OF THE VERNICK FAMILY TRUST U/A DECEMBER 29, 1983; TOOTALL LLC, a California limited liability company; SILVINA VACCARO, an individual; RAPTOR INDUSTRIES, INC., a California corporation; and ANY AND ALL PERSONS UNKNOWN, CLAIMING ANY LEGAL OR EQUITABLE RIGHT, TITLE, ESTATE, LIEN, OR INTEREST IN THE PROPERTY DESCRIBED IN THE COMPLAINT ADVERSE TO PLAINTIFF'S TITLE THERETO,

Defendants.

☒ Affects All Debtors
☐ Affects Allstate Lending Group, Inc. Only
☐ Affects Allstate Lending Group Services LLC Only

JMM | Jeffer Mangels & Mitchell LLP

Plaintiff Mighty Titans LLC, for its Complaint against Defendants Allstate Lending Group, Inc.; Allstate Lending Group Servicing, LLC; TRMY Inc.; Jordan Rosen; Alisa Abecassis, individually and as Trustee of the Alisa Abecassis Revocable Trust dated April 14, 2004; C Family Investments LLC; Michael C. Vernick, individually and as Trustee of the MCV Investments Defined Benefit Plan and Trustee of the Vernick Family Trust dated December 29, 1983; Linda R. Vernick, individually and as Trustee of the Vernick Family Trust dated December 29, 1983; Tootall LLC; Silvina Vaccaro; Raptor Industries Inc.; and Any and All Persons Unknown, Claiming Any Right, Title, Estate, Lien Or Interest In The Real Property Described In The Complaint, Adverse To Plaintiff's Ownership Or Any Cloud Upon Plaintiff's Title Thereto; Any and All Persons Known To Have Or Claim Any Interest In Said Land, Or Whose Interest Would Be Disclosed By An Inspection Of Said Land Or Inquiry Of Parties In Possession Thereof (collectively, "Defendants"), alleges as follows:

# I. JURISDICTION AND VENUE

1. This Court has jurisdiction over this Complaint and matter pursuant to 28 U.S.C. §§ 151, 157, and 1334. Jurisdiction to grant declaratory relief is conferred by 28 U.S.C. §2201 and Rule 7001 of the Federal Rules of Bankruptcy Procedure.

2. This adversary proceeding is brought pursuant to Rule 7001, *et seq.*, of the Federal Rules of Bankruptcy Procedure.

3. Venue is proper in this District pursuant to 28 U.S.C. §§ 1408 and 1409, as this adversary proceeding arises in and relates to a case under Title 11 of the United States Code that is now pending in this District.

4. This action is a core proceeding pursuant to 28 U.S.C. §§ 157(b)(1), 157(b)(2)(A), 157(b)(2)(K), and 157(b)(2)(O).

5. Pursuant to Rule 7008 of the Federal Rules of Bankruptcy Procedure, Mighty Titans LLC consents to entry of a final order or judgment on this Complaint by the Court.

# II. THE PARTIES

6. At all times relevant herein, Plaintiff Mighty Titans LLC ("Plaintiff" or "Mighty Titans") is and was a California limited liability company, duly organized, existing, and in good standing under the laws of California, with its principal place of business at 100 Wilshire Blvd., Suite 2000, Santa Monica, California 90401, and doing business in the County of Los Angeles. At certain times relevant herein, Michael G. Scannell ("Scannell") served as Manager of Mighty Titans, having been elected to that position on September 6, 2023, until his resignation on January 25, 2026.

7. Plaintiff is informed, believes, and thereon alleges that, at all times relevant herein, Defendant Allstate Lending Group, Inc. ("Allstate") is and was a California corporation with its principal place of business at 2540 Corporate Place, Suite B108, Monterey Park, California 91754. Allstate is engaged in the business of



JMM Jeffer Mangels & Mitchell LLP

brokering home loans, construction loans, and hard money loans, including in the County of Los Angeles.

8. Plaintiff is informed, believes, and thereon alleges that, at all times relevant herein, Defendant Allstate Lending Group Servicing, LLC ("ALGS") is and was a California limited liability company with its principal place of business at 2540 Corporate Place, Suite B108, Monterey Park, California 91754. Plaintiff is informed, believes, and thereon alleges that ALGS is engaged in the business of servicing loans arranged or originated by Allstate, including in the County of Los Angeles.

9. Plaintiff is informed, believes, and thereon alleges that Scannell is a co-founder and fifty-percent (50%) owner of Allstate and is the sole owner of, and had full control over, ALGS. Plaintiff also is informed, believes, and thereon alleges that Kenneth A. Rubendall ("Rubendall") is the other co-founder and fifty-percent (50%) owner of Allstate.

10. Plaintiff is informed, believes, and thereon alleges that, at all times relevant herein, Defendant TRMY Inc. ("TRMY"), is and was a Wyoming corporation doing business in the County of Los Angeles and having its principal place of business at 30 N Gould St Ste R, Sheridan, WY 82801.

11. Plaintiff is informed, believes, and thereon alleges that, at all times relevant herein, Defendant Jordan Rosen ("Rosen") is an individual residing or doing business in Los Angeles County.

12. Plaintiff is informed, believes, and thereon alleges that, at all times relevant herein, Defendant Alisa Abecassis ("Abecassis") is an individual residing or doing business in Los Angeles County, and is the Trustee of the Alisa Abecassis Revocable Trust Dated April 14, 2004 ("Abecassis Trust").

13. Plaintiff is informed, believes, and thereon alleges that, at all times relevant herein, Defendant C Family Investments, LLC ("C Family") is and was a California limited liability company doing business in the County of Los Angeles and having its principal place of business at 990 S. Hunt Road, Gustine, CA 95322.



JMM | Jeffer Mangels & Mitchell LLP

14. Plaintiff is informed, believes, and thereon alleges that, at all times relevant herein, Defendant Michael C. Vernick ("Michael Vernick") is an individual residing or doing business in Los Angeles County, is the Trustee of the MCV Investments Defined Benefit Plan ("MCV Plan"), and a Trustee of the Vernick Family Trust U/A December 29, 1983 ("Vernick Family Trust").

15. Plaintiff is informed, believes, and thereon alleges that, at all times relevant herein, Defendant Linda R. Vernick ("Linda Vernick") is an individual residing or doing business in Los Angeles County, and a Trustee of the Vernick Family Trust.

16. Plaintiff is informed, believes, and thereon alleges that, at all times relevant herein, Defendant Tootall LLC, is a California limited liability company doing business in the County of Orange and having its principal place of business at 7004 Ocean Front, Newport Beach, CA 92663.

17. Plaintiff is informed, believes, and thereon alleges that, at all times relevant herein, Defendant Silvina Vaccaro ("Silvina Vaccaro") is an individual residing or doing business in Orange County, California.

18. Plaintiff is informed, believes, and thereon alleges that, at all times relevant herein, Defendant Raptor Industries, Inc., is a California corporation company doing business in the County of Orange and having its principal place of business at 1968 S. Coast Highway, #2965, Laguna Beach, CA 92651.

19. Plaintiff does not know the true names of defendants described as Any and All Persons Unknown, Claiming Any Right, Title, Estate, Lien Or Interest In The Real Property Described In The Complaint, Adverse To Plaintiff's Ownership Or Any Cloud Upon Plaintiff's Title Thereto, and Plaintiff therefore sues said Defendants by such fictitious names. Plaintiff will amend this Complaint to allege their true names and capacities when ascertained.

20. Plaintiff is informed, believes, and thereon alleges that Defendants, in committing the wrongs against Plaintiff as alleged herein, were at all relevant times

acting as the agents, servants, employees, principals, joint venturers, alter egos, and/or partners of each other. Plaintiff is further informed, believes, and thereon alleges that in doing the things alleged herein, Defendants, and each of them, were acting within the actual or ostensible scope of authority conferred upon that Defendant by the consent, approval, and/or ratification of the other Defendant(s), whether said authority was actual, apparent, or ostensible. Plaintiff is informed, believes, and thereon alleges that each Defendant acted in all respects pertinent to this action as the agent and/or alter ego of the other Defendants, carried out a joint scheme, business plan, or policy in all respects pertinent hereto, and that the acts of each Defendant are legally attributable to the other Defendants.

## III. GENERAL ALLEGATIONS

21. In or around the Summer of 2023, Joseph Longo ("Joseph") and his brother Peter Longo ("Peter," and together with Joseph, the "Longos") began negotiations to purchase for development (the "Project") a largely unimproved residential real property lot located in the City of Los Angeles, County of Los Angeles, California 90272, commonly known as 754 Swarthmore Avenue, Pacific Palisades (the "Property"), APN 4412-009-033, and described more fully as follows:

> LOT 16, IN BLOCK 30. OF TRACT NO. 9300, IN THE CITY OF LOS ANGELES, COUNTY OF LOS ANGELES, STATE OF CALIFORNIA, AS PER MAP RECORDED IN BOOK 125, PAGES 55 THROUGH 78 INCLUSIVE OF MAPS, IN THE OFFICE OF THE COUNTY RECORDER OF SAID COUNTY. EXCEPTING THEREFROM ALL MINERALS. OIL, GAS AND RELATED SUBSTANCES LYING BELOW A DEPTH OF 500 FEET OF THE SURFACE OF THE DESCRIBED REAL PROPERTY BUT WITHOUT RIGHT OF SURFACE ENTRY UPON SAID REAL PROPERTY, AS GRANTED IN DEED RECORDED OCTOBER 5, 1987 AS INSTRUMENT NO. 87-1598923, OFFICIAL RECORDS.

JMM Jeffer Mangels & Mitchell LLP

22. As the Longos were not experienced home builders, they approached their childhood friend, Scannell, to assist with the Project because they believed that he had substantial construction and construction lending experience.

23. Scannell proposed, and the Longos agreed, that instead of obtaining a construction loan to finance the Project, Scannell would become a one-third owner in the Project by contributing his own, personal funds for the construction of the Project while the Longos would provide the capital to purchase the Property. Scannell also agreed with the Longos that he would use his expertise to review invoices from the general contractor, ensure that work was being done correctly and on schedule, and verify that payments were made only for work completed in satisfactory manner.

24. On or about September 9, 2023, to implement this business plan, the Longos and Scannell formed Mighty Titans and executed that certain Operating Agreement of Mighty Titans dated September 9, 2023 (the "Operating Agreement"). Pursuant to the Operating Agreement, Joseph and Peter, through their respective trusts, and Scannell were the three (3) members of Mighty Titans, each owning a thirty-three and a third percent (33.3333%) membership interest. Section 4.01 of the Operating Agreement provided that, "[a]s their initial Capital Contributions to [Mighty Titans], the Members have contributed all of their right, title, and interest in and to the property described on the Schedule of Members." The Schedule of Members, attached to the Operating Agreement as Schedule A, provided that the initial capital contribution required by each of the three members, including Scannell, was $1,800,000.

25. As Scannell was to personally finance and manage construction of the Project, including approving progress payments to the general contractor, he was elected to serve as the Manager of Mighty Titans.

26. Promptly after forming Mighty Titans, the Longos each wired their respective $1,800,000 capital contribution into Mighty Titans' bank account at Wells Fargo that Scannell had established and had exclusive control over, for a total of



JMM | Jeffer Mangels & Mitchell LLP

$3,600,000 that was earmarked to purchase the Property. The Longos understood, based on Scannell's representations to them and his acceptance of the Operating Agreement, which required Scannell to make a separate $1,800,000 contribution of funds to Mighty Titans, that Scannell also provided his initial $1,800,000 capital contribution into the Mighty Titans' bank account at Wells Fargo at or about this same time. Mighty Titans and the Longos would later discover that this did not happen, and that Scannell never made his initial capital contribution of $1,800,000, or any amount, to Mighty Titans.

27. On or about September 11, 2023, Mighty Titans purchased the Property for approximately $3,530,000, using capital contribution funds provided by the Longos, and took title to the Property as evidenced by that certain Grant Deed dated September 11, 2023, and recorded on November 2, 2023, as Instrument Number 20230752307 in the Official Records of Los Angeles County ("Grant Deed"), a true and correct copy of which is attached hereto as **Exhibit A** and incorporated by reference as if set forth in full.

28. Because Mighty Titans' business plan, as agreed to by the Longos and Scannell as Mighty Titans' members and owners, did not contemplate obtaining any financing to construct the Project, the Operating Agreement did not authorize Scannell, as Manager, to borrow money on behalf of Mighty Titans, and/or encumber the Property with any security interest or other instrument. To that end, Section 10.03 of the Operating Agreement provided that the Members, and not the Manager, may take certain actions "without the consent or approval of the Manager," including, but not limited to, "materially altering the Company's business or deviating from any approved business plan of the Company."

29. Scannell did not contribute any of his own personal funds toward construction of the Project (or acquisition of the Property), and failed to provide his initial contribution of $1,800,000, or any amount, to Mighty Titans as required by the Operating Agreement. Instead, Scannell purported to cause Mighty Titans, without

the knowledge or consent of the Longos and without authorization and in violation of his fiduciary and contractual duties to Mighty Titans under the Operating Agreement, to obtain a purported loan from Allstate in the principal amount of $1,250,000 ("Loan 1"), which Scannell purported to secure by executing a Deed of Trust dated November 27, 2023, which he caused to be recorded on title to the Property on January 4, 2024, as Instrument Number No. 20240009250 in the Official Records of Los Angeles County (the "Loan 1 DOT").

30. Loan 1 DOT identified Allstate as "Lender" and ALGS as Trustee of Loan 1 DOT. Scannell purported to sign Loan 1 DOT on behalf of Mighty Titans in his capacity as a "Member" only. As a "Member" of Mighty Titans (or even as its "Manager"), Scannell had no authority to enter into or execute Loan 1 DOT or the purported promissory note secured by Loan 1 DOT. Additionally, despite purporting to obtain Loan 1 from Allstate and causing Loan 1 DOT to be recorded against the Property in the amount of $1,250,000, Scannell and Allstate did not deposit any or all of the Loan 1 funds into Mighty Titans' bank account or otherwise use the purported loan proceeds for Mighty Titans' benefit, but instead diverted those funds elsewhere in a manner currently unknown to Mighty Titans.

31. On or about January 1, 2024, Scannell, acting on behalf of Allstate, executed an Assignment of Deed of Trust dated January 1, 2024, recorded as instrument number 20240075747 on February 2, 2024, in the Official Records of Los Angeles County (the "Loan 1 DOT Assignment No. 1"), by which Allstate purported to assign all of Allstate's beneficial interest in and under Loan 1 DOT in fractional amounts to various third parties.

32. After assigning 100% of Allstate's purported but unauthorized and invalid beneficial interest under the Loan 1 DOT by executing and recording the Loan 1 DOT Assignment No. 1, on or about September 16, 2024, Scannell, again acting on behalf of Allstate, executed an Assignment of Deed of Trust dated September 16, 2024, and recorded on September 27, 2024, as Instrument Number

20240662782 in the Official Records of Los Angeles County (the "Loan 1 DOT Assignment No. 2"), by which Allstate purported to assign – for the second time – all of Allstate's beneficial interest under Loan 1 DOT in fractional amounts to additional third parties.

33. Despite Allstate having twice assigned all of its purported but unauthorized and invalid beneficial interests under Loan 1 DOT, on or about September 27, 2024, Scannell, acting on behalf of Allstate and ALGS, executed a Substitution of Trustee and Full Reconveyance dated September 27, 2024, and recorded on October 2, 2024, as instrument number 20240675689 in the Official Records of Los Angeles County (the "Loan 1 DOT Reconveyance"), by which Allstate, as beneficiary, purported to appoint ALGS as trustee under Loan 1 DOT, and ALGS, as trustee, fully reconveyed Loan 1 DOT back to Mighty Titans.

34. A few days later, on October 1, 2024, Scannell, again acting without the knowledge or consent of the Longos and without authority to do so and in violation of his fiduciary and contractual duties to Mighty Titans, caused Mighty Titans to purportedly obtain another loan from Allstate in the principal amount of $2,000,000 ("Loan 2"). Loan 2 is allegedly evidenced by a purported Promissory Note purportedly executed by Mighty Titans dated September 30, 2024, in favor of Allstate in the principal amount of $2,000,000 (the "Note") that is secured by a Deed of Trust dated September 30, 2024, and recorded on October 3, 2024, in the Los Angeles County Recorder's Office as Doc. No. 20240675690 against the Property (the "Deed of Trust"), a true and correct copy of which is attached hereto as **Exhibit B** and incorporated by reference as if set forth in full, which identifies Allstate as the "Lender" and "beneficiary" of the Deed of Trust. ALGS is the named and acting Trustee with respect to the Deed of Trust and is the servicer of the purported Note secured by the Deed of Trust. Mighty Titans is informed, believes, and thereon alleges that the Note and/or Deed of Trust contain prevailing party attorneys' fees provisions that entitle Mighty Titans to recover its reasonable attorneys' fees

incurred in connection with this action.

35. By an Assignment recorded on October 3, 2024, as Instrument No. 20240675691 (the "Assignment"), a true and correct copy of which is attached hereto as **Exhibit C** and incorporated by reference as if set forth in full, the entire beneficial interest in the Deed of Trust was assigned to the following individuals and entities in various fractionalized interests: TRMY Inc. (as to a 15% interest), Jordan Rosen (as to a 5% interest), Alisa Abecassis, Trustee of the Alisa Abecassis Revocable Trust dated April 14, 2004 (as to a 5% interest), C Family Investments LLC (as to a 22.75% interest), Michael C. Vernick, as Trustee of the MCV Investments Defined Benefit Plan (as to a 10.5% interest), Michael L. Vernick and Linda R. Vernick, Trustees of the Vernick Family Trust U/A December 29, 1983 (as to a 4.25% interest), Tootall LLC (as to a 12.5% interest), Silvina Vaccaro (as to a 12.5% interest), and Raptor Industries Inc. (as to a 12.5% interest) (collectively, the "Deed of Trust Holders").

36. Despite purporting to obtain Loan 2 from Allstate and causing the Deed of Trust to be recorded against the Property, Scannell and Allstate did not deposit any or all of the Loan 2 funds into Mighty Titans' bank account and/or otherwise use them for Mighty Titans' benefit, but diverted those funds elsewhere in a manner currently unknown to Mighty Titans.

37. On January 7, 2025, the "Palisades Fire" broke out, resulting in the total destruction of the Project. With respect to the Property and the fire damage caused by the "Palisades Fire," Mighty Titans' insurer paid insurance proceeds totaling $1,943,673.10 into Mighty Titans' Wells Fargo bank account, to which Scannell had sole access and control. Scannell and ALGS stole and transferred directly to ALGS at least $1,690,344.09 of the insurance proceeds paid to Mighty Titans. In fact, Scannell has confessed and admitted to the Longos such theft and transfer of Mighty Titans' insurance proceeds to ALGS. Mighty Titans' bank records prove Scannell's and ALGS' theft and misappropriation of Mighty Titans' insurance proceeds.



JMM Jeffer Mangels & Mitchell LLP

38. On January 25, 2026, Scannell resigned as Manager of Mighty Titans and transferred his purported membership interest in Mighty Titans to the Longos.

39. Mighty Titans has demanded, in writing, that Allstate, ALGS, and the Deed of Trust Holders, and each of them, fully reconvey, cancel, and remove from the Property's chain of title, the Deed of Trust and Assignment, but they, and each of them, have failed and refused to do so.

40. Mighty Titans' investigation into the facts and circumstances surrounding Loan 1, Loan 2, the Note, the Deed of Trust, and the Assignment, and the related fraudulent and bad acts of Scannell, Allstate, and ALGS is continuing.

41. The Loan 1 DOT slandered Mighty Titans' title to the Property. Loan 1 was fraudulent, unauthorized, invalid and unenforceable and caused damage to Mighty Titans.

42. Loan 2 was, is and remains fraudulent, unauthorized, invalid and unenforceable and caused, and continues to cause, damage to Mighty Titans. The Deed of Trust and Assignment, which are fraudulent, unauthorized, invalid and unenforceable, were, are and remain as clouds on the title of the Property. The Deed of Trust and Assignment slandered, and continue to slander, Mighty Titans' title to the Property. The Deed of Trust and Assignment are preventing Mighty Titans from obtaining secured financing against the Property to rehabilitate and repair the damage caused to the Property and its improvements by the Palisades Fire and to complete the construction (and sale) of the improvements on the Property. Loan 2, the Note, the Deed of Trust, and Assignment, and the actions taken in connection therewith damaged, and continue to cause damage to, Mighty Titans, including, among other things, lost profit, increased construction and borrowing costs, delayed completion of the Project, delayed sale of the Project, and the incurring of attorney's fees. Additionally, Mighty Titans is entitled to punitive damages.

43. The damages caused to and incurred by Mighty Titans by the foregoing, including punitive damages that are warranted based on the fraudulent and bad acts

JMM | Jeffer Mangels & Mitchell LLP

set forth above, including with respect to Loan 2, the Note, the Deed of Trust, and/or the Assignment, perpetrated by the Defendants, and each of them, who acted together in concert and conspired together with respect to the actions set forth herein against Mighty Titans, is continuing and increases each day and is presently in a sum to be proven at trial.

**FIRST CLAIM FOR RELIEF**

**FOR QUIET TITLE**

**(Against All Defendants)**

44. Plaintiff realleges and incorporates by reference paragraphs 1 through 43 of this Complaint as though fully set forth herein.

45. Plaintiff owns the Property in fee simple by virtue of the Grant Deed, and therefore has standing to bring this action.

46. Plaintiff is informed, believes, and thereon alleges that one or more of Defendants claim an interest in the Property, including under Loan 2, the Note, the Deed of Trust, and/or the Assignment, which interest is and are adverse to Plaintiff.

47. Plaintiff seeks to quiet title to the Property in itself and against the adverse claims of Defendants, or any of them, under Loan 2, the Note, the Deed of Trust, and/or the Assignment, or otherwise (the "Adverse Claims").

48. The Adverse Claims are without any right whatsoever and Loan 2, the Note, the Deed of Trust, and the Assignment are invalid, unenforceable, and/or void. Defendants have no right, title, estate, lien or interest whatsoever in the Property, including no interest or claim adverse to Plaintiff's rights and interest in and to the Property.

49. Plaintiff seeks to quiet title to the Property in itself as of November 2, 2023, the date that the Grant Deed was recorded on title to the Property.

**SECOND CLAIM FOR RELIEF**

**FOR CANCELLATION OF INSTRUMENTS**

**(Against All Defendants)**

50. Plaintiff realleges and incorporates by reference paragraphs 1 through 49 of this Complaint as though fully set forth herein.

51. Plaintiff seeks cancellation of Loan 2, the Note, the Deed of Trust, and the Assignment on the basis that each is invalid, unenforceable, void, and/or voidable. Loan 2, the Note, the Deed of Trust, and the Assignment were obtained, created, and recorded in violation of the Operating Agreement, which Scannell, Allstate and ALGS had actual knowledge of, and as part of a fraud perpetrated by Defendants, or any of them, against Plaintiff as alleged hereinabove.

52. Plaintiff therefore is entitled to judgment declaring Loan 2, the Note, the Deed of Trust, and the Assignment to be void and of no force or effect, and ordering that Defendants deliver each of Loan 2, the Note, the Deed of Trust, and the Assignment to the Clerk of the Court for cancellation.

53. Plaintiff is informed, believes, and thereon alleges that Defendants, and each of them, knew when they created, executed and/or recorded Loan 2, the Note, the Deed of Trust, and the Assignment that each was in violation of the Operating Agreement and was a fraudulent and invalid instrument and they performed these acts with the intent to defraud Plaintiff and impair Plaintiff's rights and title in and to the Property. Plaintiff therefore is entitled to exemplary and punitive damages against Defendants.

**THIRD CLAIM FOR RELIEF**

**FOR DECLARATORY RELIEF**

**(Against All Defendants)**

54. Plaintiff realleges and incorporates by reference paragraphs 1 through 53 of this Complaint as though fully set forth herein.



JMM Jeffer Mangels & Mitchell LLP

55. A dispute has now arisen between Plaintiff and Defendants, in that Plaintiff contends that each and all of Loan 2, the Note, the Deed of Trust, and the Assignment, are invalid, void, and/or voidable because each was procured in violation of the Operating Agreement and through fraud and/or the unauthorized and unlawful misconduct by Defendants as alleged herein. Upon information and belief, Defendants dispute these contentions.

56. Accordingly, Plaintiff seeks a declaration of the parties' respective rights and obligations concerning the Property. Specifically, Plaintiff seeks a declaration that: (1) Loan 2, the Note, the Deed of Trust, and the Assignment each are invalid, unenforceable, void and/or voidable and of no legal force and effect; (2) Loan 2, the Note, the Deed of Trust, and the Assignment shall each be delivered to the Clerk of the Court for cancellation; (3) Plaintiff is the owner of record title in and to the Property as of November 2, 2023 by virtue of the execution, delivery, and recording of the Grant Deed; and (4) Defendants, and each of them, have no interest, claim or right in or to the Property.

## FOURTH CLAIM FOR RELIEF

## FOR ACCOUNTING

**(Against All Defendants)**

57. Plaintiff realleges and incorporates by reference paragraphs 1 through 56 of this Complaint as though set forth in full herein.

58. Defendants, and each of them, are obligated to return property misappropriated from Plaintiff, or compensate Plaintiff as alleged above, and they have a duty to faithfully and fairly account to Plaintiff for all of Plaintiff's property that has been misappropriated. Such duty includes, without limitation, to account for the funding, closing, and disposition of all proceeds related to Loan 2, the Note, the Deed of Trust, and the Assignment. Notwithstanding their duty to do so, Defendants, and each of them, have failed and refused to account to Plaintiff.

59. As a result of the fraudulent and wrongful conduct alleged herein, Plaintiff is entitled to equitable relief in the form of an accounting from Defendants, and each of them, to determine the nature and extent of its injuries, to ascertain the funding, closing, and disposition of all proceeds related to Loan 2, the Note, the Deed of Trust, and the Assignment, and to require Defendants, and each of them, to disgorge any profits or revenues received as a result of such misconduct.

**FIFTH CLAIM FOR RELIEF**

**FOR SLANDER OF TITLE**

**(Against All Defendants)**

60. Plaintiff realleges and incorporates by reference paragraphs 1 through 59 of this Complaint as though set forth in full herein.

61. At all relevant times, Plaintiff has owned the Property in fee simple as evidenced by the Grant Deed attached hereto as **Exhibit A**, and therefore has standing to bring this action.

62. As a result of the fraud and other misconduct committed by Defendants, and each of them, in creating, executing, and/or recording and maintaining the Deed of Trust and/or Assignment, Defendants have directly disparaged Plaintiff's title to the Property and to its interests therein. Specifically, Defendants, and each of them, created, executed and/or recorded and maintained the fraudulent and invalid Deed of Trust and/or Assignment with the intention that third parties and the public in general would rely on the false and erroneous statements therein, thereby causing doubt to be cast on Plaintiff's interest and title in and to the Property, and further causing Plaintiff's interest and title in and to the Property to be subject to improper encumbrances or transfers.

63. As a result of the recordation of the Deed of Trust and/or Assignment on title to the Property, and the acts of Defendants, and each of them in connection with creating, executing, and/or recording and maintaining those instruments, Plaintiff's



JMM Jeffer Mangels & Mitchell LLP

rights and title in and to the Property was and continues to be impaired.

64. The Deed of Trust was published when it was recorded on or about October 3, 2024 in the Los Angeles County Recorder's Office as Doc. No. 20240675690.

65. The Assignment was published when it was recorded on or about October 3, 2024, the Los Angeles County Recorder's Office as Doc. No. 20240675691.

66. The statements made by Defendants in the Deed of Trust and Assignment were false in material respects as alleged hereinabove.

67. In executing and recording the fraudulent and invalid Deed of Trust and Assignment, Defendants, and each of them, acted fraudulently and with malice and oppression and for the express purpose and in furtherance of a deceitful and wrongful scheme of defrauding and depriving Plaintiff of its rights and interests in and to the Property by creating a wholly false and misleading appearance that a legitimate security interest and assignment thereof in the Property had been created when Defendants knew that no such security interest and/or assignment thereof was authorized or lawful, and that the Deed of Trust and Assignment that Defendants, or any of them, recorded and maintained with the Los Angeles County Recorder's Office were and are fraudulent and invalid.

68. As a result of the actions of Defendants, and each of them, as alleged herein, Plaintiff has suffered damages in an amount to be proven at trial, but in no event less than the jurisdictional minimum.

69. The aforementioned acts of Defendants were willful, oppressive, and malicious, thereby entitling Plaintiff to punitive damages.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff prays for Judgment against Defendants as follows:

**On the First Claim for Relief for Quiet Title:**

A. For a Judgment quieting title to the Property in Plaintiff's favor as of

November 2, 2023, and specifically to the effect that Loan 2, the Note, the Deed of Trust, and the Assignment are invalid, unenforceable, void, and/or voidable and must be expunged from title to the Property, and that none of the Defendants have any interest, claim, lien, or rights in or to the Property;

B. Costs of suit; and

C. Such other and further relief as the Court may deem just and proper.

**On the Second Claim for Relief for Cancellation of Instruments:**

A. For a Judgment cancelling the Loan 2, the Note, the Deed of Trust, and the Assignment, determining that each such instrument is void and of no legal force or effect, and ordering Defendants to deliver each of those instruments to the Clerk of the Court for cancellation and/or reconveyance;

B. General, special, and consequential damages according to proof in an amount to be determined at trial;

C. Punitive and exemplary damages;

D. Prejudgment interest as permitted by law; and

E. Such other and further relief as the Court may deem just and proper.

**On the Third Claim for Relief for Declaratory Relief:**

A. For a judicial declaration that: (1) Loan 2, the Note, the Deed of Trust, and the Assignment, are each invalid, unenforceable, void and/or voidable and of no legal force and effect, and must be expunged from title to the Property; (2) Loan 2, the Note, the Deed of Trust, and the Assignment shall each be delivered to the Clerk of the Court for cancellation and/or reconveyance; (3) Plaintiff is the owner of record title in and to the Property as of November 2, 2023 by virtue of the execution, delivery, and recording of the Grant Deed; and (4) Defendants, and each of them, have no interest, claim, lien, or right in or to the Property.

B. Attorneys' fees, court costs, and interest according to proof in an amount to be determined at time of trial or entry of judgment; and

C. Such other and further relief as the Court may deem just and proper.

**On the Fourth Claim for Relief for Accounting:**

A. An accounting from Defendants, and each of them, to determine the nature and extent of Plaintiff's injuries, and to require Defendants, and each of them, to disgorge any profits or revenues received as a result of their misconduct; and

B. Such other and further relief as the Court may deem just and proper.

**On the Fifth Claim for Relief for Slander of Title:**

A. For an award of damages against Defendants, and each of them, jointly and severally, in an amount according to proof at trial;

B. Such other and further relief as the Court may deem just and proper.

**On All Causes of Action:**

A. General, special, and consequential damages according to proof in an amount to be determined at trial;

B. Punitive and exemplary damages as permitted by law on those causes of action for which such damages are proper;

C. Prejudgment interest;

D. Reasonable attorneys' fees as permitted by law and contract;

E. Costs of suit incurred herein; and

F. Such other and further relief as the Court may deem just and proper.

DATED: August 18, 2026

JEFFER MANGELS & MITCHELL LLP
THOMAS M. GEHER
JON A. WEININGER

By: */s/ Thomas M. Geher*
THOMAS M. GEHER
Attorneys for Plaintiff MIGHTY TITANS LLC

JMM | Jeffer Mangels & Mitchell LLP

# VERIFICATION

**STATE OF CALIFORNIA, COUNTY OF ORANGE**

I have read the foregoing **VERIFIED COMPLAINT FOR: 1. QUIET TITLE 2. CANCELLATION OF INSTRUMENTS; 3. DECLARATORY RELIEF; 4. FRAUD AND DECEIT; 5. BREACH OF FIDUCIARY DUTY; 6. AIDING AND ABETTING BREACH OF FIDUCIARY DUTY; 7. CONVERSION; 8. VIOLATION OF PENAL CODE § 496; 9. ACCOUNTING; 10. BREACH OF WRITTEN CONTRACT; 11. CONSTRUCTIVE TRUST; AND 12. RESULTING TRUST** and know its contents.

I am the Manager of Mighty Titans LLC, a party to this action, and am authorized to make this verification for and on its behalf, and I make this verification for that reason. I am informed and believe and on that ground allege that the matters stated in the foregoing document are true.

I declare under penalty of perjury under the laws of the State of California that the foregoing is true and correct.

Executed on August 14, 2026, at Los Angeles, California.

Joseph Longo
Print Name of Signatory

[signature]
Signature

JMM Jeffer Mangels & Mitchell LLP

# EXHIBIT A

**This page is part of your document - DO NOT DISCARD**

# 20230752307

**Pages: 0004**

**Recorded/Filed in Official Records**
**Recorder's Office, Los Angeles County,**
**California**

**11/02/23 AT 08:00AM**

| | |
|---|---|
| FEES: | 28.00 |
| TAXES: | 19,600.00 |
| OTHER: | 0.00 |
| PAID: | 19,628.00 |

LEADSHEET

202311020260017

**00023921743**

014372463

**SEQ:**
**01**

SECURE - 8:00AM

**THIS FORM IS NOT TO BE DUPLICATED**

E465200

1500-2309399

**RECORDING REQUESTED BY:**
Fidelity National Title

**MAIL TAX STATEMENT**
**AND WHEN RECORDED MAIL TO:**

Mighty Titans LLC
2540 Corporate Place, Suite B-108
Monterey Park, CA 91754

THIS SPACE FOR RECORDER'S USE ONLY:

**Title Order No.:** 1500-2309399 **Escrow No.:** BW-10665-23
**APN#:** 4412-009-033

# GRANT DEED

THE UNDERSIGNED GRANTOR(S) DECLARE(S)

**DOCUMENTARY TRANSFER TAX is** $3,850.00
**CITY TRANSFER TAX** $15,750.00

[X] computed on full value of property conveyed, or
[ ] computed on full value less value of liens or encumbrances remaining at time of sale.
[ ] Unincorporated area [X] City of Los Angeles **AND**

FOR A VALUABLE CONSIDERATION, receipt of which is hereby acknowledged,

**754 Smore, LLC, a California Limited Liability Company**

hereby GRANT(s) to:

**Mighty Titans LLC, a California Limited Liability Company**

the real property in the City of Los Angeles, County of Los Angeles, State of California, described as:

LEGAL DESCRIPTION ATTACHED HERETO AS EXHIBIT "A" AND MADE A PART HEREOF

**Also Known as: 754 Swarthmore Avenue, Los Angeles, CA 90272**

**DATED: September 11, 2023**

**Signature Page attached hereto and made a part hereof**

MAIL TAX STATEMENTS TO PARTY SHOWN BELOW; IF NO PARTY SHOWN, MAIL AS SHOWN ABOVE:

**Title Order No.: 1500-2309399** **Escrow No.: BW-10665-23** **APN#:4412-009-033**

## SIGNATURE PAGE

**Title of Document: GRANT DEED**

**Date of Document:** September 11, 2023

754 Smore LLC, a California Limited Liability Company

By: ______________________
Itay Mevorakh, Authorized Signer

Itay Mevorakh, Authorized Signer

## ACKNOWLEDGMENT

| A notary public or other officer completing this certificate verifies only the identity of the individual who signed the document to which this certificate is attached, and not the truthfulness, accuracy, or validity of that document. |
|---|

STATE OF CALIFORNIA
COUNTY OF LOS ANGELES
On SEPTEMBER 11, 2023
before me, JASON M. VALENZUELA,
A Notary Public personally appeared
ITAY MEVORAKH
______________________

who proved to me on the basis of satisfactory evidence to be the person(s) whose name(s) is/are subscribed to the within instrument and acknowledged to me that he/she/they executed the same in his/her/their authorized capacity(ies), and that by his/her/their signature(s) on the instrument the person(s), or the entity upon behalf of which the person(s) acted, executed the instrument.

**I certify under PENALTY OF PERJURY under the laws of the State of California that the foregoing paragraph is true and correct.**

WITNESS my hand and official seal.

Signature ______________________ (Seal)

JASON M. VALENZUELA
COMM. #2382244
Notary Public - California
Los Angeles County
My Comm. Expires Nov. 8, 2025

# EXHIBIT A

Legal Description

**For APN/Parcel ID(s): 4412-009-033**

THE LAND REFERRED TO HEREIN BELOW IS SITUATED IN THE CITY OF LOS ANGELES, COUNTY OF LOS ANGELES, STATE OF CALIFORNIA AND IS DESCRIBED AS FOLLOWS:

LOT 16, IN BLOCK 30, OF TRACT NO. 9300, IN THE CITY OF LOS ANGELES, COUNTY OF LOS ANGELES, STATE OF CALIFORNIA, AS PER MAP RECORDED IN BOOK 125, PAGES 55 THROUGH 78 INCLUSIVE OF MAPS, IN THE OFFICE OF THE COUNTY RECORDER OF SAID COUNTY.

EXCEPTING THEREFROM ALL MINERALS, OIL, GAS AND RELATED SUBSTANCES LYING BELOW A DEPTH OF 500 FEET OF THE SURFACE OF THE DESCRIBED REAL PROPERTY BUT WITHOUT RIGHT OF SURFACE ENTRY UPON SAID REAL PROPERTY, AS GRANTED IN DEED RECORDED OCTOBER 5, 1987 AS INSTRUMENT NO. 87-1598923, OFFICIAL RECORDS.

# EXHIBIT B

**This page is part of your document - DO NOT DISCARD**

# 20240675690

**Pages: 0025**

**Recorded/Filed in Official Records**
**Recorder's Office, Los Angeles County,**
**California**

**10/03/24 AT 08:00AM**

| | |
|---|---|
| FEES: | 120.00 |
| TAXES: | 0.00 |
| OTHER: | 0.00 |
| SB2: | 75.00 |
| PAID: | 195.00 |

LEADSHEET

202410030160003

**00024847655**

014925123

**SEQ:**
**02**

SECURE - 8:00AM

**THIS FORM IS NOT TO BE DUPLICATED**

E682329

**SC-11074 BU**

Recording requested by
SoCal TITLE COMPANY
SC 11094 RU

Recording Requested By:
ALLSTATE LENDING GROUP, INC

And After Recording Return To:
ALLSTATE LENDING GROUP,
INC
2540 CORPORATE PLACE STE B108
MONTEREY PARK, CALIFORNIA 91754
Loan Number: 24-10962

APN 4412-009-033 [Space Above This Line For Recording Data]

# DEED OF TRUST

## DEFINITIONS

Words used in multiple sections of this document are defined below and other words are defined under the caption TRANSFER OF RIGHTS IN THE PROPERTY and in Sections 3, 4, 10, 11, 12, 16, 19, 24, and 25. Certain rules regarding the usage of words used in this document are also provided in Section 17.

### Parties

(A) **"Borrower"** is MIGHTY TITANS LLC, A CALIFORNIA LIMITED LIABILITY COMPANY

currently residing at 2540 CORPORATE PLACE SUITE B108, MONTEREY PARK, CALIFORNIA 91754
Borrower is the trustor under this Security Instrument.

(B) **"Lender"** is ALLSTATE LENDING GROUP, INC

Lender is a CALIFORNIA CORPORATION organized and existing under the laws of CALIFORNIA . Lender's address is 2540 CORPORATE PLACE STE B108, MONTEREY PARK, CALIFORNIA 91754
Lender is the beneficiary under this Security Instrument. The term "Lender" includes any successors and assigns of Lender.

(C) **"Trustee"** is ALLSTATE LENDING GROUP SERVICING LLC

Trustee's address is 2540 CORPORATE PLACE, SUITE B108, MONTEREY PARK, CALIFORNIA 91754 .
The term "Trustee" includes any substitute/successor Trustee.

**Documents**

**(D) "Note"** means the promissory note dated September 30, 2024 , and signed by each Borrower who is legally obligated for the debt under that promissory note, that is in either (i) paper form, using Borrower's written pen and ink signature, or (ii) electronic form, using Borrower's adopted Electronic Signature in accordance with the UETA or E-SIGN, as applicable. The Note evidences the legal obligation of each Borrower who signed the Note to pay Lender TWO MILLION AND 00/100 Dollars (U.S. $ 2,000,000.00 ) plus interest. Each Borrower who signed the Note has promised to pay this debt in regular monthly payments and to pay the debt in full not later than September 1, 2025 .
**(E) "Riders"** means all Riders to this Security Instrument that are signed by Borrower. All such Riders are incorporated into and deemed to be a part of this Security Instrument. The following Riders are to be signed by Borrower [check box as applicable]:

- [ ] Adjustable Rate Rider
- [X] 1-4 Family Rider
- [ ] Second Home Rider
- [ ] Condominium Rider
- [ ] Planned Unit Development Rider
- [X] Other(s) [specify]: Balloon Payment Rider

**(F) "Security Instrument"** means this document, which is dated September 30, 2024 , together with all Riders to this document.

**Additional Definitions**

**(G) "Applicable Law"** means all controlling applicable federal, state, and local statutes, regulations, ordinances, and administrative rules and orders (that have the effect of law) as well as all applicable final, non-appealable judicial opinions.
**(H) "Community Association Dues, Fees, and Assessments"** means all dues, fees, assessments, and other charges that are imposed on Borrower or the Property by a condominium association, homeowners association, or similar organization.
**(I) "Default"** means: (i) the failure to pay any Periodic Payment or any other amount secured by this Security Instrument on the date it is due; (ii) a breach of any representation, warranty, covenant, obligation, or agreement in this Security Instrument; (iii) any materially false, misleading, or inaccurate information or statement to Lender provided by Borrower or any persons or entities acting at Borrower's direction or with Borrower's knowledge or consent, or failure to provide Lender with material information in connection with the Loan, as described in Section 8; or (iv) any action or proceeding described in Section 12(e).
**(J) "Electronic Fund Transfer"** means any transfer of funds, other than a transaction originated by check, draft, or similar paper instrument, which is initiated through an electronic terminal, telephonic instrument, computer, or magnetic tape so as to order, instruct, or authorize a financial institution to debit or credit an account. Such term includes, but is not limited to, point-of-sale transfers, automated teller machine transactions, transfers initiated by

telephone or other electronic device capable of communicating with such financial institution, wire transfers, and automated clearinghouse transfers.

**(K) "Electronic Signature"** means an "Electronic Signature" as defined in the UETA or E-SIGN, as applicable.

**(L) "E-SIGN"** means the Electronic Signatures in Global and National Commerce Act (15 U.S.C. § 7001 *et seq.*), as it may be amended from time to time, or any applicable additional or successor legislation that governs the same subject matter.

**(M) "Escrow Items"** means: (i) taxes and assessments and other items that can attain priority over this Security Instrument as a lien or encumbrance on the Property; (ii) leasehold payments or ground rents on the Property, if any; (iii) premiums for any and all insurance required by Lender under Section 5; (iv) Mortgage Insurance premiums, if any, or any sums payable by Borrower to Lender in lieu of the payment of Mortgage Insurance premiums in accordance with the provisions of Section 11; and (v) Community Association Dues, Fees, and Assessments if Lender requires that they be escrowed beginning at Loan closing or at any time during the Loan term.

**(N) "Loan"** means the debt obligation evidenced by the Note, plus interest, any prepayment charges, costs, expenses, and late charges due under the Note, and all sums due under this Security Instrument, plus interest.

**(O) "Loan Servicer"** means the entity that has the contractual right to receive Borrower's Periodic Payments and any other payments made by Borrower, and administers the Loan on behalf of Lender. Loan Servicer does not include a sub-servicer, which is an entity that may service the Loan on behalf of the Loan Servicer.

**(P) "Miscellaneous Proceeds"** means any compensation, settlement, award of damages, or proceeds paid by any third party (other than insurance proceeds paid under the coverages described in Section 5) for: (i) damage to, or destruction of, the Property; (ii) condemnation or other taking of all or any part of the Property; (iii) conveyance in lieu of condemnation; or (iv) misrepresentations of, or omissions as to, the value and/or condition of the Property.

**(Q) "Mortgage Insurance"** means insurance protecting Lender against the nonpayment of, or Default on, the Loan.

**(R) "Partial Payment"** means any payment by Borrower, other than a voluntary prepayment permitted under the Note, which is less than a full outstanding Periodic Payment.

**(S) "Periodic Payment"** means the regularly scheduled amount due for (i) principal and interest under the Note, plus (ii) any amounts under Section 3.

**(T) "Property"** means the property described below under the heading "TRANSFER OF RIGHTS IN THE PROPERTY."

**(U) "Rents"** means all amounts received by or due Borrower in connection with the lease, use, and/or occupancy of the Property by a party other than Borrower.

**(V) "RESPA"** means the Real Estate Settlement Procedures Act (12 U.S.C. § 2601 *et seq.*) and its implementing regulation, Regulation X (12 C.F.R. Part 1024), as they may be amended from time to time, or any additional or successor federal legislation or regulation that governs the same subject matter. When used in this Security Instrument, "RESPA" refers to all requirements and restrictions that would apply to a "federally related mortgage loan" even if the Loan does not qualify as a "federally related mortgage loan" under RESPA.

**(W) "Successor in Interest of Borrower"** means any party that has taken title to the Property, whether or not that party has assumed Borrower's obligations under the Note and/or this Security Instrument.

**(X) "UETA"** means the Uniform Electronic Transactions Act, as enacted by the jurisdiction in which the Property is located, as it may be amended from time to time, or any applicable additional or successor legislation that governs the same subject matter.

## TRANSFER OF RIGHTS IN THE PROPERTY

This Security Instrument secures to Lender (i) the repayment of the Loan, and all renewals, extensions, and modifications of the Note, and (ii) the performance of Borrower's covenants and agreements under this Security Instrument and the Note. For this purpose, Borrower irrevocably grants and conveys to Trustee, in trust, with power of sale, the following described property located in the

COUNTY of LOS ANGELES :
[Type of Recording Jurisdiction] [Name of Recording Jurisdiction]

LOT 16, IN BLOCK 30, OF TRACT NO. 9300, IN THE CITY OF LOS ANGELES, COUNTY OF LOS ANGELES, STATE OF CALIFORNIA, AS PER MAP RECORDED IN BOOK 125, PAGES 55 THROUGH 78 INCLUSIVE OF MAPS, IN THE OFFICE OF THE COUNTY RECORDER OF SAID COUNTY.
EXCEPTING THEREFROM ALL MINERALS, OIL, GAS AND RELATED SUBSTANCES LYING BELOW A DEPTH OF 500 FEET OF THE SURFACE OF THE DESCRIBED REAL PROPERTY BUT WITHOUT RIGHT OF SURFACE ENTRY UPON SAID REAL PROPERTY, AS GRANTED IN DEED RECORDED OCTOBER 5, 1987 AS INSTRUMENT NO. 87-1598923, OFFICIAL RECORDS.
A.P.N.: 4412-009-033

which currently has the address of 754 NORTH SWARTHMORE AVENUE
[Street]
PACIFIC PALISADES , California 90272 ("Property Address");
[City] [Zip Code]

TOGETHER WITH all the improvements now or subsequently erected on the property, including replacements and additions to the improvements on such property, all property rights, including, without limitation, all easements, appurtenances, Rents, issues and profits thereof, royalties, mineral rights, oil or gas rights or profits, water rights, miscellaneous proceeds, insurance proceeds, and fixtures now or subsequently a part of the property. All of the foregoing is referred to in this Security Instrument as the "Property."

BORROWER REPRESENTS, WARRANTS, COVENANTS, AND AGREES that: (i) Borrower lawfully owns and possesses the Property conveyed in this Security Instrument in fee simple or lawfully has the right to use and occupy the Property under a leasehold estate; (ii) Borrower has the right to grant and convey the Property or Borrower's leasehold interest in the Property; and (iii) the Property is unencumbered, and not subject to any other ownership interest in the Property, except for encumbrances and ownership interests of record. Borrower warrants generally the title to the Property and covenants and agrees to defend the title to the Property against all claims and demands, subject to any encumbrances and ownership interests of record as of Loan closing.

THIS SECURITY INSTRUMENT combines uniform covenants for national use with limited variations and non-uniform covenants that reflect specific California state requirements to constitute a uniform security instrument covering real property.

**UNIFORM COVENANTS.** Borrower and Lender covenant and agree as follows:

**1. Payment of Principal, Interest, Escrow Items, Prepayment Charges, and Late Charges.** Borrower will pay each Periodic Payment when due. Borrower will also pay any prepayment charges and late charges due under the Note, and any other amounts due under this Security Instrument. Payments due under the Note and this Security Instrument must be made in U.S. currency. If any check or other instrument received by Lender as payment under

the Note or this Security Instrument is returned to Lender unpaid, Lender may require that any or all subsequent payments due under the Note and this Security Instrument be made in one or more of the following forms, as selected by Lender: (a) cash; (b) money order; (c) certified check, bank check, treasurer's check, or cashier's check, provided any such check is drawn upon an institution whose deposits are insured by a U.S. federal agency, instrumentality, or entity; or (d) Electronic Fund Transfer.

Payments are deemed received by Lender when received at the location designated in the Note or at such other location as may be designated by Lender in accordance with the notice provisions in Section 16. Lender may accept or return any Partial Payments in its sole discretion pursuant to Section 2.

Any offset or claim that Borrower may have now or in the future against Lender will not relieve Borrower from making the full amount of all payments due under the Note and this Security Instrument or performing the covenants and agreements secured by this Security Instrument.

**2. Acceptance and Application of Payments or Proceeds.**

**(a) Acceptance and Application of Partial Payments.** Lender may accept and either apply or hold in suspense Partial Payments in its sole discretion in accordance with this Section 2. Lender is not obligated to accept any Partial Payments or to apply any Partial Payments at the time such payments are accepted, and also is not obligated to pay interest on such unapplied funds. Lender may hold such unapplied funds until Borrower makes payment sufficient to cover a full Periodic Payment, at which time the amount of the full Periodic Payment will be applied to the Loan. If Borrower does not make such a payment within a reasonable period of time, Lender will either apply such funds in accordance with this Section 2 or return them to Borrower. If not applied earlier, Partial Payments will be credited against the total amount due under the Loan in calculating the amount due in connection with any foreclosure proceeding, payoff request, loan modification, or reinstatement. Lender may accept any payment insufficient to bring the Loan current without waiver of any rights under this Security Instrument or prejudice to its rights to refuse such payments in the future.

**(b) Order of Application of Partial Payments and Periodic Payments.** Except as otherwise described in this Section 2, if Lender applies a payment, such payment will be applied to each Periodic Payment in the order in which it became due, beginning with the oldest outstanding Periodic Payment, as follows: first to interest and then to principal due under the Note, and finally to Escrow Items. If all outstanding Periodic Payments then due are paid in full, any payment amounts remaining may be applied to late charges and to any amounts then due under this Security Instrument. If all sums then due under the Note and this Security Instrument are paid in full, any remaining payment amount may be applied, in Lender's sole discretion, to a future Periodic Payment or to reduce the principal balance of the Note.

If Lender receives a payment from Borrower in the amount of one or more Periodic Payments and the amount of any late charge due for a delinquent Periodic Payment, the payment may be applied to the delinquent payment and the late charge.

When applying payments, Lender will apply such payments in accordance with Applicable Law.

**(c) Voluntary Prepayments.** Voluntary prepayments will be applied as described in the Note.

**(d) No Change to Payment Schedule.** Any application of payments, insurance proceeds, or Miscellaneous Proceeds to principal due under the Note will not extend or postpone the due date, or change the amount, of the Periodic Payments.

**3. Funds for Escrow Items.**

**(a) Escrow Requirement; Escrow Items.** Borrower must pay to Lender on the day Periodic Payments are due under the Note, until the Note is paid in full, a sum of money to provide for payment of amounts due for all Escrow Items (the "Funds"). The amount of the Funds required to be paid each month may change during the term of the Loan. Borrower must promptly furnish to Lender all notices or invoices of amounts to be paid under this Section 3.

**(b) Payment of Funds; Waiver.** Borrower must pay Lender the Funds for Escrow Items unless Lender waives this obligation in writing, or unless prohibited by Applicable Law. Lender may waive this obligation for any Escrow Item at any time. In the event of such waiver or prohibition, Borrower must pay directly, when and where payable,

the amounts due for any Escrow Items and Lender may require Borrower to provide proof of direct payment of those items within such time period as Lender may require. Borrower's obligation to make such timely payments and to provide proof of payment is deemed to be a covenant and agreement of Borrower under this Security Instrument. If Borrower is obligated to pay Escrow Items directly, and Borrower fails to pay timely the amount due for an Escrow Item, Lender may exercise its rights under Section 9 to pay such amount and Borrower will be obligated to repay to Lender any such amount in accordance with Section 9.

Unless prohibited by Applicable Law, Lender may withdraw the waiver as to any or all Escrow Items at any time by giving a notice in accordance with Section 16; upon such withdrawal, Borrower must pay to Lender all Funds for such Escrow Items, and in such amounts, that are then required under this Section 3.

**(c) Amount of Funds; Application of Funds.** Lender may, at any time, collect and hold Funds in an amount up to, but not in excess of, the maximum amount a lender can require under RESPA. Lender will estimate the amount of Funds due in accordance with Applicable Law.

The Funds will be held in an institution whose deposits are insured by a U.S. federal agency, instrumentality, or entity (including Lender, if Lender is an institution whose deposits are so insured) or in any Federal Home Loan Bank. Lender will apply the Funds to pay the Escrow Items no later than the time specified under RESPA. Lender may not charge Borrower for: (i) holding and applying the Funds; (ii) annually analyzing the escrow account; or (iii) verifying the Escrow Items, unless Lender pays Borrower interest on the Funds and Applicable Law permits Lender to make such a charge. Unless Lender and Borrower agree in writing or Applicable Law requires interest to be paid on the Funds, Lender will not be required to pay Borrower any interest or earnings on the Funds. Lender will give to Borrower, without charge, an annual accounting of the Funds as required by RESPA.

**(d) Surplus; Shortage and Deficiency of Funds.** In accordance with RESPA, if there is a surplus of Funds held in escrow, Lender will account to Borrower for such surplus. If Borrower's Periodic Payment is delinquent by more than 30 days, Lender may retain the surplus in the escrow account for the payment of the Escrow Items. If there is a shortage or deficiency of Funds held in escrow, Lender will notify Borrower and Borrower will pay to Lender the amount necessary to make up the shortage or deficiency in accordance with RESPA.

Upon payment in full of all sums secured by this Security Instrument, Lender will promptly refund to Borrower any Funds held by Lender.

**4. Charges; Liens.** Borrower must pay (a) all taxes, assessments, charges, fines, and impositions attributable to the Property which have priority or may attain priority over this Security Instrument, (b) leasehold payments or ground rents on the Property, if any, and (c) Community Association Dues, Fees, and Assessments, if any. If any of these items are Escrow Items, Borrower will pay them in the manner provided in Section 3.

Borrower must promptly discharge any lien that has priority or may attain priority over this Security Instrument unless Borrower: (aa) agrees in writing to the payment of the obligation secured by the lien in a manner acceptable to Lender, but only so long as Borrower is performing under such agreement; (bb) contests the lien in good faith by, or defends against enforcement of the lien in, legal proceedings which Lender determines, in its sole discretion, operate to prevent the enforcement of the lien while those proceedings are pending, but only until such proceedings are concluded; or (cc) secures from the holder of the lien an agreement satisfactory to Lender that subordinates the lien to this Security Instrument (collectively, the "Required Actions"). If Lender determines that any part of the Property is subject to a lien that has priority or may attain priority over this Security Instrument and Borrower has not taken any of the Required Actions in regard to such lien, Lender may give Borrower a notice identifying the lien. Within 10 days after the date on which that notice is given, Borrower must satisfy the lien or take one or more of the Required Actions.

**5. Property Insurance.**

**(a) Insurance Requirement; Coverages.** Borrower must keep the improvements now existing or subsequently erected on the Property insured against loss by fire, hazards included within the term "extended coverage," and any other hazards including, but not limited to, earthquakes, winds, and floods, for which Lender requires insurance. Borrower must maintain the types of insurance Lender requires in the amounts (including deductible levels) and for

the periods that Lender requires. What Lender requires pursuant to the preceding sentences can change during the term of the Loan, and may exceed any minimum coverage required by Applicable Law. Borrower may choose the insurance carrier providing the insurance, subject to Lender's right to disapprove Borrower's choice, which right will not be exercised unreasonably.

**(b) Failure to Maintain Insurance.** If Lender has a reasonable basis to believe that Borrower has failed to maintain any of the required insurance coverages described above, Lender may obtain insurance coverage, at Lender's option and at Borrower's expense. Unless required by Applicable Law, Lender is under no obligation to advance premiums for, or to seek to reinstate, any prior lapsed coverage obtained by Borrower. Lender is under no obligation to purchase any particular type or amount of coverage and may select the provider of such insurance in its sole discretion. Before purchasing such coverage, Lender will notify Borrower if required to do so under Applicable Law. Any such coverage will insure Lender, but might not protect Borrower, Borrower's equity in the Property, or the contents of the Property, against any risk, hazard, or liability and might provide greater or lesser coverage than was previously in effect, but not exceeding the coverage required under Section 5(a). Borrower acknowledges that the cost of the insurance coverage so obtained may significantly exceed the cost of insurance that Borrower could have obtained. Any amounts disbursed by Lender for costs associated with reinstating Borrower's insurance policy or with placing new insurance under this Section 5 will become additional debt of Borrower secured by this Security Instrument. These amounts will bear interest at the Note rate from the date of disbursement and will be payable, with such interest, upon notice from Lender to Borrower requesting payment.

**(c) Insurance Policies.** All insurance policies required by Lender and renewals of such policies: (i) will be subject to Lender's right to disapprove such policies; (ii) must include a standard mortgage clause; and (iii) must name Lender as mortgagee and/or as an additional loss payee, and Borrower further agrees to generally assign rights to insurance proceeds to the holder of the Note up to the amount of the outstanding loan balance. Lender will have the right to hold the policies and renewal certificates. If Lender requires, Borrower will promptly give to Lender proof of paid premiums and renewal notices. If Borrower obtains any form of insurance coverage, not otherwise required by Lender, for damage to, or destruction of, the Property, such policy must include a standard mortgage clause and must name Lender as mortgagee and/or as an additional loss payee, and Borrower further agrees to generally assign rights to insurance proceeds to the holder of the Note up to the amount of the outstanding loan balance.

**(d) Proof of Loss; Application of Proceeds.** In the event of loss, Borrower must give prompt notice to the insurance carrier and Lender. Lender may make proof of loss if not made promptly by Borrower. Any insurance proceeds, whether or not the underlying insurance was required by Lender, will be applied to restoration or repair of the Property, if Lender deems the restoration or repair to be economically feasible and determines that Lender's security will not be lessened by such restoration or repair.

If the Property is to be repaired or restored, Lender will disburse from the insurance proceeds any initial amounts that are necessary to begin the repair or restoration, subject to any restrictions applicable to Lender. During the subsequent repair and restoration period, Lender will have the right to hold such insurance proceeds until Lender has had an opportunity to inspect such Property to ensure the work has been completed to Lender's satisfaction (which may include satisfying Lender's minimum eligibility requirements for persons repairing the Property, including, but not limited to, licensing, bond, and insurance requirements) provided that such inspection must be undertaken promptly. Lender may disburse proceeds for the repairs and restoration in a single payment or in a series of progress payments as the work is completed, depending on the size of the repair or restoration, the terms of the repair agreement, and whether Borrower is in Default on the Loan. Lender may make such disbursements directly to Borrower, to the person repairing or restoring the Property, or payable jointly to both. Lender will not be required to pay Borrower any interest or earnings on such insurance proceeds unless Lender and Borrower agree in writing or Applicable Law requires otherwise. Fees for public adjusters, or other third parties, retained by Borrower will not be paid out of the insurance proceeds and will be the sole obligation of Borrower.

If, in accordance with Applicable Law, Lender deems the restoration or repair not to be economically feasible or Lender's security would be lessened by such restoration or repair, the insurance proceeds will be applied to the

sums secured by this Security Instrument, whether or not then due, with the excess, if any, paid to Borrower. Such insurance proceeds will be applied in the order that Partial Payments are applied in Section 2(b).

**(e) Insurance Settlements; Assignment of Proceeds.** If Borrower abandons the Property, Lender may file, negotiate, and settle any available insurance claim and related matters. If Borrower does not respond within 30 days to a notice from Lender that the insurance carrier has offered to settle a claim, then Lender may negotiate and settle the claim. The 30-day period will begin when the notice is given. In either event, or if Lender acquires the Property under Section 26 or otherwise, Borrower is unconditionally assigning to Lender (i) Borrower's rights to any insurance proceeds in an amount not to exceed the amounts unpaid under the Note and this Security Instrument, and (ii) any other of Borrower's rights (other than the right to any refund of unearned premiums paid by Borrower) under all insurance policies covering the Property, to the extent that such rights are applicable to the coverage of the Property. If Lender files, negotiates, or settles a claim, Borrower agrees that any insurance proceeds may be made payable directly to Lender without the need to include Borrower as an additional loss payee. Lender may use the insurance proceeds either to repair or restore the Property (as provided in Section 5(d)) or to pay amounts unpaid under the Note or this Security Instrument, whether or not then due, in accordance with Applicable Law.

**6. Occupancy.** Borrower must occupy, establish, and use the Property as Borrower's principal residence within 60 days after the execution of this Security Instrument and must continue to occupy the Property as Borrower's principal residence for at least one year after the date of occupancy, unless Lender otherwise agrees in writing, which consent will not be unreasonably withheld, or unless extenuating circumstances exist that are beyond Borrower's control.

**7. Preservation, Maintenance, and Protection of the Property; Inspections.** Borrower will not destroy, damage, or impair the Property, allow the Property to deteriorate, or commit waste on the Property. Whether or not Borrower is residing in the Property, Borrower must maintain the Property in order to prevent the Property from deteriorating or decreasing in value due to its condition. Unless Lender determines pursuant to Section 5 that repair or restoration is not economically feasible, Borrower will promptly repair the Property if damaged to avoid further deterioration or damage.

If insurance or condemnation proceeds are paid to Lender in connection with damage to, or the taking of, the Property, Borrower will be responsible for repairing or restoring the Property only if Lender has released proceeds for such purposes. Lender may disburse proceeds for the repairs and restoration in a single payment or in a series of progress payments as the work is completed, depending on the size of the repair or restoration, the terms of the repair agreement, and whether Borrower is in Default on the Loan. Lender may make such disbursements directly to Borrower, to the person repairing or restoring the Property, or payable jointly to both. If the insurance or condemnation proceeds are not sufficient to repair or restore the Property, Borrower remains obligated to complete such repair or restoration.

Lender may make reasonable entries upon and inspections of the Property. If Lender has reasonable cause, Lender may inspect the interior of the improvements on the Property. Lender will give Borrower notice at the time of or prior to such an interior inspection specifying such reasonable cause.

**8. Borrower's Loan Application.** Borrower will be in Default if, during the Loan application process, Borrower or any persons or entities acting at Borrower's direction or with Borrower's knowledge or consent gave materially false, misleading, or inaccurate information or statements to Lender (or failed to provide Lender with material information) in connection with the Loan, including, but not limited to, overstating Borrower's income or assets, understating or failing to provide documentation of Borrower's debt obligations and liabilities, and misrepresenting Borrower's occupancy or intended occupancy of the Property as Borrower's principal residence.

**9. Protection of Lender's Interest in the Property and Rights Under this Security Instrument.**

**(a) Protection of Lender's Interest.** If: (i) Borrower fails to perform the covenants and agreements contained in this Security Instrument; (ii) there is a legal proceeding or government order that might significantly affect Lender's interest in the Property and/or rights under this Security Instrument (such as a proceeding in bankruptcy, probate, for condemnation or forfeiture, for enforcement of a lien that has priority or may attain priority over this Security

Instrument, or to enforce laws or regulations); or (iii) Lender reasonably believes that Borrower has abandoned the Property, then Lender may do and pay for whatever is reasonable or appropriate to protect Lender's interest in the Property and/or rights under this Security Instrument, including protecting and/or assessing the value of the Property, and securing and/or repairing the Property. Lender's actions may include, but are not limited to: (I) paying any sums secured by a lien that has priority or may attain priority over this Security Instrument; (II) appearing in court; and (III) paying: (A) reasonable attorneys' fees and costs; (B) property inspection and valuation fees; and (C) other fees incurred for the purpose of protecting Lender's interest in the Property and/or rights under this Security Instrument, including its secured position in a bankruptcy proceeding. Securing the Property includes, but is not limited to, exterior and interior inspections of the Property, entering the Property to make repairs, changing locks, replacing or boarding up doors and windows, draining water from pipes, eliminating building or other code violations or dangerous conditions, and having utilities turned on or off. Although Lender may take action under this Section 9, Lender is not required to do so and is not under any duty or obligation to do so. Lender will not be liable for not taking any or all actions authorized under this Section 9.

**(b) Avoiding Foreclosure; Mitigating Losses.** If Borrower is in Default, Lender may work with Borrower to avoid foreclosure and/or mitigate Lender's potential losses, but is not obligated to do so unless required by Applicable Law. Lender may take reasonable actions to evaluate Borrower for available alternatives to foreclosure, including, but not limited to, obtaining credit reports, title reports, title insurance, property valuations, subordination agreements, and third-party approvals. Borrower authorizes and consents to these actions. Any costs associated with such loss mitigation activities may be paid by Lender and recovered from Borrower as described below in Section 9(c), unless prohibited by Applicable Law.

**(c) Additional Amounts Secured.** Any amounts disbursed by Lender under this Section 9 will become additional debt of Borrower secured by this Security Instrument. These amounts may bear interest at the Note rate from the date of disbursement and will be payable, with such interest, upon notice from Lender to Borrower requesting payment.

**(d) Leasehold Terms.** If this Security Instrument is on a leasehold, Borrower will comply with all the provisions of the lease. Borrower will not surrender the leasehold estate and interests conveyed, or terminate or cancel the ground lease. Borrower will not, without the express written consent of Lender, alter or amend the ground lease. If Borrower acquires fee title to the Property, the leasehold and the fee title will not merge unless Lender agrees to the merger in writing.

**10. Assignment of Rents.**

**(a) Assignment of Rents.** If the Property is leased to, used by, or occupied by a third party ("Tenant"), Borrower is unconditionally assigning and transferring to Lender any Rents, regardless of to whom the Rents are payable. This assignment of Rents constitutes a perfected, absolute and present assignment. Lender grants to Borrower a license to collect, but not prior to accrual, and retain the Rents; however, upon the occurrence and during the continuance of an event of Default, Borrower's license to collect and retain the Rents will immediately terminate. Under this license, Borrower will receive the Rents until (i) Lender has given Borrower notice of Default pursuant to Section 26, and (ii) Lender has given notice to the Tenant that the Rents are to be paid to Lender. This Section 10 constitutes an absolute assignment and not an assignment for additional security only.

**(b) Notice of Default.** If Lender gives notice of Default to Borrower, all of the following will apply, unless prohibited by Applicable Law: (i) all Rents received by Borrower must be held by Borrower as trustee for the benefit of Lender only, to be applied to the sums secured by the Security Instrument; (ii) Lender will be entitled to collect and receive all of the Rents; (iii) Borrower agrees to instruct each Tenant that Tenant is to pay all Rents due and unpaid to Lender upon Lender's written demand to the Tenant; (iv) Borrower will ensure that each Tenant pays all Rents due to Lender and will take whatever action is necessary to collect such Rents if not paid to Lender; (v) unless Applicable Law provides otherwise, all Rents collected by Lender will be applied first to the costs of taking control of and managing the Property and collecting the Rents, including, but not limited to, reasonable attorneys' fees and costs, receiver's fees, premiums on receiver's bonds, repair and maintenance costs, insurance premiums, taxes,

assessments, and other charges on the Property, and then to any other sums secured by this Security Instrument; (vi) Lender, or any judicially appointed receiver, will be liable to account for only those Rents actually received; and (vii) Lender will be entitled to have a receiver appointed to take possession of and manage the Property and collect the Rents and profits derived from the Property without any showing as to the inadequacy of the Property as security.

**(c) Funds Paid by Lender.** If the Rents are not sufficient to cover the costs of taking control of and managing the Property and of collecting the Rents, any funds paid by Lender for such purposes will become indebtedness of Borrower to Lender secured by this Security Instrument pursuant to Section 9.

**(d) Limitation on Collection of Rents.** Borrower may not collect any of the Rents more than one month in advance of the time when the Rents become due, except for security or similar deposits.

**(e) No Other Assignment of Rents.** Borrower represents, warrants, covenants, and agrees that Borrower has not signed any prior assignment of the Rents, will not make any further assignment of the Rents, and has not performed, and will not perform, any act that could prevent Lender from exercising its rights under this Security Instrument.

**(f) Control and Maintenance of the Property.** Unless required by Applicable Law, Lender, or a receiver appointed under Applicable Law, is not obligated to enter upon, take control of, or maintain the Property before or after giving notice of Default to Borrower. However, Lender, or a receiver appointed under Applicable Law, may do so at any time when Borrower is in Default, subject to Applicable Law.

**(g) Additional Provisions.** Any application of the Rents will not cure or waive any Default or invalidate any other right or remedy of Lender. This Section 10 does not relieve Borrower of Borrower's obligations under Section 6.

This Section 10 will terminate when all the sums secured by this Security Instrument are paid in full.

**11. Mortgage Insurance.**

**(a) Payment of Premiums; Substitution of Policy; Loss Reserve; Protection of Lender.** If Lender required Mortgage Insurance as a condition of making the Loan, Borrower will pay the premiums required to maintain the Mortgage Insurance in effect. If Borrower was required to make separately designated payments toward the premiums for Mortgage Insurance, and (i) the Mortgage Insurance coverage required by Lender ceases for any reason to be available from the mortgage insurer that previously provided such insurance, or (ii) Lender determines in its sole discretion that such mortgage insurer is no longer eligible to provide the Mortgage Insurance coverage required by Lender, Borrower will pay the premiums required to obtain coverage substantially equivalent to the Mortgage Insurance previously in effect, at a cost substantially equivalent to the cost to Borrower of the Mortgage Insurance previously in effect, from an alternate mortgage insurer selected by Lender.

If substantially equivalent Mortgage Insurance coverage is not available, Borrower will continue to pay to Lender the amount of the separately designated payments that were due when the insurance coverage ceased to be in effect. Lender will accept, use, and retain these payments as a non-refundable loss reserve in lieu of Mortgage Insurance. Such loss reserve will be non-refundable, even when the Loan is paid in full, and Lender will not be required to pay Borrower any interest or earnings on such loss reserve, unless required by Applicable Law.

Lender will no longer require loss reserve payments if Mortgage Insurance coverage (in the amount and for the period that Lender requires) provided by an insurer selected by Lender again becomes available, is obtained, and Lender requires separately designated payments toward the premiums for Mortgage Insurance.

If Lender required Mortgage Insurance as a condition of making the Loan and Borrower was required to make separately designated payments toward the premiums for Mortgage Insurance, Borrower will pay the premiums required to maintain Mortgage Insurance in effect, or to provide a non-refundable loss reserve, until Lender's requirement for Mortgage Insurance ends in accordance with any written agreement between Borrower and Lender providing for such termination or until termination is required by Applicable Law. Nothing in this Section 11 affects Borrower's obligation to pay interest at the Note rate.

**(b) Mortgage Insurance Agreements.** Mortgage Insurance reimburses Lender for certain losses Lender may incur if Borrower does not repay the Loan as agreed. Borrower is not a party to the Mortgage Insurance policy or coverage.

Mortgage insurers evaluate their total risk on all such insurance in force from time to time, and may enter into agreements with other parties that share or modify their risk, or reduce losses. These agreements may require the mortgage insurer to make payments using any source of funds that the mortgage insurer may have available (which may include funds obtained from Mortgage Insurance premiums).

As a result of these agreements, Lender, another insurer, any reinsurer, any other entity, or any affiliate of any of the foregoing, may receive (directly or indirectly) amounts that derive from (or might be characterized as) a portion of Borrower's payments for Mortgage Insurance, in exchange for sharing or modifying the mortgage insurer's risk, or reducing losses. Any such agreements will not: (i) affect the amounts that Borrower has agreed to pay for Mortgage Insurance, or any other terms of the Loan; (ii) increase the amount Borrower will owe for Mortgage Insurance; (iii) entitle Borrower to any refund; or (iv) affect the rights Borrower has, if any, with respect to the Mortgage Insurance under the Homeowners Protection Act of 1998 (12 U.S.C. § 4901 *et seq.*), as it may be amended from time to time, or any additional or successor federal legislation or regulation that governs the same subject matter ("HPA"). These rights under the HPA may include the right to receive certain disclosures, to request and obtain cancellation of the Mortgage Insurance, to have the Mortgage Insurance terminated automatically, and/or to receive a refund of any Mortgage Insurance premiums that were unearned at the time of such cancellation or termination.

**12. Assignment and Application of Miscellaneous Proceeds; Forfeiture.**

**(a) Assignment of Miscellaneous Proceeds.** Borrower is unconditionally assigning the right to receive all Miscellaneous Proceeds to Lender and agrees that such amounts will be paid to Lender.

**(b) Application of Miscellaneous Proceeds upon Damage to Property.** If the Property is damaged, any Miscellaneous Proceeds will be applied to restoration or repair of the Property, if Lender deems the restoration or repair to be economically feasible and Lender's security will not be lessened by such restoration or repair. During such repair and restoration period, Lender will have the right to hold such Miscellaneous Proceeds until Lender has had an opportunity to inspect the Property to ensure the work has been completed to Lender's satisfaction (which may include satisfying Lender's minimum eligibility requirements for persons repairing the Property, including, but not limited to, licensing, bond, and insurance requirements) provided that such inspection must be undertaken promptly. Lender may pay for the repairs and restoration in a single disbursement or in a series of progress payments as the work is completed, depending on the size of the repair or restoration, the terms of the repair agreement, and whether Borrower is in Default on the Loan. Lender may make such disbursements directly to Borrower, to the person repairing or restoring the Property, or payable jointly to both. Unless Lender and Borrower agree in writing or Applicable Law requires interest to be paid on such Miscellaneous Proceeds, Lender will not be required to pay Borrower any interest or earnings on such Miscellaneous Proceeds. If Lender deems the restoration or repair not to be economically feasible or Lender's security would be lessened by such restoration or repair, the Miscellaneous Proceeds will be applied to the sums secured by this Security Instrument, whether or not then due, unless prohibited by Applicable Law, with the excess, if any, paid to Borrower. Such Miscellaneous Proceeds will be applied in the order that Partial Payments are applied in Section 2(b).

**(c) Application of Miscellaneous Proceeds upon Condemnation, Destruction, or Loss in Value of the Property.** In the event of a total taking, destruction, or loss in value of the Property, all of the Miscellaneous Proceeds will be applied to the sums secured by this Security Instrument, whether or not then due, unless prohibited by Applicable Law, with the excess, if any, paid to Borrower.

In the event of a partial taking, destruction, or loss in value of the Property (each, a "Partial Devaluation") where the fair market value of the Property immediately before the Partial Devaluation is equal to or greater than the amount of the sums secured by this Security Instrument immediately before the Partial Devaluation, a percentage of the Miscellaneous Proceeds will be applied to the sums secured by this Security Instrument, unless prohibited by Applicable Law, or unless Borrower and Lender otherwise agree in writing. The amount of the Miscellaneous

Proceeds that will be so applied is determined by multiplying the total amount of the Miscellaneous Proceeds by a percentage calculated by taking (i) the total amount of the sums secured immediately before the Partial Devaluation, and dividing it by (ii) the fair market value of the Property immediately before the Partial Devaluation. Any balance of the Miscellaneous Proceeds will be paid to Borrower.

In the event of a Partial Devaluation where the fair market value of the Property immediately before the Partial Devaluation is less than the amount of the sums secured immediately before the Partial Devaluation, all of the Miscellaneous Proceeds will be applied to the sums secured by this Security Instrument, whether or not the sums are then due, unless Borrower and Lender otherwise agree in writing.

**(d) Settlement of Claims.** Lender is authorized to collect and apply the Miscellaneous Proceeds either to the sums secured by this Security Instrument, whether or not then due, or to restoration or repair of the Property, if Borrower (i) abandons the Property, or (ii) fails to respond to Lender within 30 days after the date Lender notifies Borrower that the Opposing Party (as defined in the next sentence) offers to settle a claim for damages. "Opposing Party" means the third party that owes Borrower the Miscellaneous Proceeds or the party against whom Borrower has a right of action in regard to the Miscellaneous Proceeds.

**(e) Proceeding Affecting Lender's Interest in the Property.** Borrower will be in Default if any action or proceeding begins, whether civil or criminal, that, in Lender's judgment, could result in forfeiture of the Property or other material impairment of Lender's interest in the Property or rights under this Security Instrument, unless prohibited by Applicable Law. Borrower can cure such a Default and, if acceleration has occurred, reinstate as provided in Section 20, by causing the action or proceeding to be dismissed with a ruling that, in Lender's judgment, precludes forfeiture of the Property or other material impairment of Lender's interest in the Property or rights under this Security Instrument. Borrower is unconditionally assigning to Lender the proceeds of any award or claim for damages that are attributable to the impairment of Lender's interest in the Property, which proceeds will be paid to Lender. All Miscellaneous Proceeds that are not applied to restoration or repair of the Property will be applied in the order that Partial Payments are applied in Section 2(b).

**13. Borrower Not Released; Forbearance by Lender Not a Waiver.** Borrower or any Successor in Interest of Borrower will not be released from liability under this Security Instrument if Lender extends the time for payment or modifies the amortization of the sums secured by this Security Instrument. Lender will not be required to commence proceedings against any Successor in Interest of Borrower, or to refuse to extend time for payment or otherwise modify amortization of the sums secured by this Security Instrument, by reason of any demand made by the original Borrower or any Successors in Interest of Borrower. Any forbearance by Lender in exercising any right or remedy including, without limitation, Lender's acceptance of payments from third persons, entities, or Successors in Interest of Borrower or in amounts less than the amount then due, will not be a waiver of, or preclude the exercise of, any right or remedy by Lender.

**14. Joint and Several Liability; Signatories; Successors and Assigns Bound.** Borrower's obligations and liability under this Security Instrument will be joint and several. However, any Borrower who signs this Security Instrument but does not sign the Note: (a) signs this Security Instrument to mortgage, grant, and convey such Borrower's interest in the Property under the terms of this Security Instrument; (b) signs this Security Instrument to waive any applicable inchoate rights and any available homestead exemptions, unless prohibited by Applicable Law; (c) signs this Security Instrument to assign any Miscellaneous Proceeds, Rents, or other earnings from the Property to Lender; (d) is not personally obligated to pay the sums due under the Note or this Security Instrument; and (e) agrees that Lender and any other Borrower can agree to extend, modify, forbear, or make any accommodations with regard to the terms of the Note or this Security Instrument without such Borrower's consent and without affecting such Borrower's obligations under this Security Instrument.

Subject to the provisions of Section 19, any Successor in Interest of Borrower who assumes Borrower's obligations under this Security Instrument in writing, and is approved by Lender, will obtain all of Borrower's rights, obligations, and benefits under this Security Instrument. Borrower will not be released from Borrower's obligations and liability under this Security Instrument unless Lender agrees to such release in writing.

**15. Loan Charges.**

**(a) Tax and Flood Determination Fees.** Lender may require Borrower to pay (i) a one-time charge for a real estate tax verification and/or reporting service used by Lender in connection with this Loan, and (ii) either (A) a one-time charge for flood zone determination, certification, and tracking services, or (B) a one-time charge for flood zone determination and certification services and subsequent charges each time remappings or similar changes occur that reasonably might affect such determination or certification. Borrower will also be responsible for the payment of any fees imposed by the Federal Emergency Management Agency, or any successor agency, at any time during the Loan term, in connection with any flood zone determinations.

**(b) Default Charges.** If permitted under Applicable Law, Lender may charge Borrower fees for services performed in connection with Borrower's Default to protect Lender's interest in the Property and rights under this Security Instrument, including: (i) reasonable attorneys' fees and costs; (ii) property inspection, valuation, mediation, and loss mitigation fees; and (iii) other related fees.

**(c) Permissibility of Fees.** In regard to any other fees, the absence of express authority in this Security Instrument to charge a specific fee to Borrower should not be construed as a prohibition on the charging of such fee. Lender may not charge fees that are expressly prohibited by this Security Instrument or by Applicable Law.

**(d) Savings Clause.** If Applicable Law sets maximum loan charges, and that law is finally interpreted so that the interest or other loan charges collected or to be collected in connection with the Loan exceed the permitted limits, then (i) any such loan charge will be reduced by the amount necessary to reduce the charge to the permitted limit, and (ii) any sums already collected from Borrower which exceeded permitted limits will be refunded to Borrower. Lender may choose to make this refund by reducing the principal owed under the Note or by making a direct payment to Borrower. If a refund reduces principal, the reduction will be treated as a partial prepayment without any prepayment charge (whether or not a prepayment charge is provided for under the Note). To the extent permitted by Applicable Law, Borrower's acceptance of any such refund made by direct payment to Borrower will constitute a waiver of any right of action Borrower might have arising out of such overcharge.

**16. Notices; Borrower's Physical Address.** All notices given by Borrower or Lender in connection with this Security Instrument must be in writing.

**(a) Notices to Borrower.** Unless Applicable Law requires a different method, any written notice to Borrower in connection with this Security Instrument will be deemed to have been given to Borrower when (i) mailed by first class mail, or (ii) actually delivered to Borrower's Notice Address (as defined in Section 16(c) below) if sent by means other than first class mail or Electronic Communication (as defined in Section 16(b) below). Notice to any one Borrower will constitute notice to all Borrowers unless Applicable Law expressly requires otherwise. If any notice to Borrower required by this Security Instrument is also required under Applicable Law, the Applicable Law requirement will satisfy the corresponding requirement under this Security Instrument.

**(b) Electronic Notice to Borrower.** Unless another delivery method is required by Applicable Law, Lender may provide notice to Borrower by e-mail or other electronic communication ("Electronic Communication") if: (i) agreed to by Lender and Borrower in writing; (ii) Borrower has provided Lender with Borrower's e-mail or other electronic address ("Electronic Address"); (iii) Lender provides Borrower with the option to receive notices by first class mail or by other non-Electronic Communication instead of by Electronic Communication; and (iv) Lender otherwise complies with Applicable Law. Any notice to Borrower sent by Electronic Communication in connection with this Security Instrument will be deemed to have been given to Borrower when sent unless Lender becomes aware that such notice is not delivered. If Lender becomes aware that any notice sent by Electronic Communication is not delivered, Lender will resend such communication to Borrower by first class mail or by other non-Electronic Communication. Borrower may withdraw the agreement to receive Electronic Communications from Lender at any time by providing written notice to Lender of Borrower's withdrawal of such agreement.

**(c) Borrower's Notice Address.** The address to which Lender will send Borrower notice ("Notice Address") will be the Property Address unless Borrower has designated a different address by written notice to Lender. If Lender and Borrower have agreed that notice may be given by Electronic Communication, then Borrower may designate an

Electronic Address as Notice Address. Borrower will promptly notify Lender of Borrower's change of Notice Address, including any changes to Borrower's Electronic Address if designated as Notice Address. If Lender specifies a procedure for reporting Borrower's change of Notice Address, then Borrower will report a change of Notice Address only through that specified procedure.

**(d) Notices to Lender.** Any notice to Lender will be given by delivering it or by mailing it by first class mail to Lender's address stated in this Security Instrument unless Lender has designated another address (including an Electronic Address) by notice to Borrower. Any notice in connection with this Security Instrument will be deemed to have been given to Lender only when actually received by Lender at Lender's designated address (which may include an Electronic Address). If any notice to Lender required by this Security Instrument is also required under Applicable Law, the Applicable Law requirement will satisfy the corresponding requirement under this Security Instrument.

**(e) Borrower's Physical Address.** In addition to the designated Notice Address, Borrower will provide Lender with the address where Borrower physically resides, if different from the Property Address, and notify Lender whenever this address changes.

**17. Governing Law; Severability; Rules of Construction.** This Security Instrument is governed by federal law and the law of the State of California. All rights and obligations contained in this Security Instrument are subject to any requirements and limitations of Applicable Law. If any provision of this Security Instrument or the Note conflicts with Applicable Law (i) such conflict will not affect other provisions of this Security Instrument or the Note that can be given effect without the conflicting provision, and (ii) such conflicting provision, to the extent possible, will be considered modified to comply with Applicable Law. Applicable Law might explicitly or implicitly allow the parties to agree by contract or it might be silent, but such silence should not be construed as a prohibition against agreement by contract. Any action required under this Security Instrument to be made in accordance with Applicable Law is to be made in accordance with the Applicable Law in effect at the time the action is undertaken.

As used in this Security Instrument: (a) words in the singular will mean and include the plural and vice versa; (b) the word "may" gives sole discretion without any obligation to take any action; (c) any reference to "Section" in this document refers to Sections contained in this Security Instrument unless otherwise noted; and (d) the headings and captions are inserted for convenience of reference and do not define, limit, or describe the scope or intent of this Security Instrument or any particular Section, paragraph, or provision.

**18. Borrower's Copy.** One Borrower will be given one copy of the Note and of this Security Instrument.

**19. Transfer of the Property or a Beneficial Interest in Borrower.** For purposes of this Section 19 only, "Interest in the Property" means any legal or beneficial interest in the Property, including, but not limited to, those beneficial interests transferred in a bond for deed, contract for deed, installment sales contract, or escrow agreement, the intent of which is the transfer of title by Borrower to a purchaser at a future date.

If all or any part of the Property or any Interest in the Property is sold or transferred (or if Borrower is not a natural person and a beneficial interest in Borrower is sold or transferred) without Lender's prior written consent, Lender may require immediate payment in full of all sums secured by this Security Instrument. However, Lender will not exercise this option if such exercise is prohibited by Applicable Law.

If Lender exercises this option, Lender will give Borrower notice of acceleration. The notice will provide a period of not less than 30 days from the date the notice is given in accordance with Section 16 within which Borrower must pay all sums secured by this Security Instrument. If Borrower fails to pay these sums prior to, or upon, the expiration of this period, Lender may invoke any remedies permitted by this Security Instrument without further notice or demand on Borrower and will be entitled to collect all expenses incurred in pursuing such remedies, including, but not limited to: (a) reasonable attorneys' fees and costs; (b) property inspection and valuation fees; and (c) other fees incurred to protect Lender's Interest in the Property and/or rights under this Security Instrument.

**20. Borrower's Right to Reinstate the Loan after Acceleration.** If Borrower meets certain conditions, Borrower will have the right to reinstate the Loan and have enforcement of this Security Instrument discontinued at any time up to the later of (a) five days before any foreclosure sale of the Property, or (b) such other period as

Applicable Law might specify for the termination of Borrower's right to reinstate. This right to reinstate will not apply in the case of acceleration under Section 19.

To reinstate the Loan, Borrower must satisfy all of the following conditions: (aa) pay Lender all sums that then would be due under this Security Instrument and the Note as if no acceleration had occurred; (bb) cure any Default of any other covenants or agreements under this Security Instrument or the Note; (cc) pay all expenses incurred in enforcing this Security Instrument or the Note, including, but not limited to: (i) reasonable attorneys' fees and costs; (ii) property inspection and valuation fees; and (iii) other fees incurred to protect Lender's interest in the Property and/or rights under this Security Instrument or the Note; and (dd) take such action as Lender may reasonably require to assure that Lender's interest in the Property and/or rights under this Security Instrument or the Note, and Borrower's obligation to pay the sums secured by this Security Instrument or the Note, will continue unchanged.

Lender may require that Borrower pay such reinstatement sums and expenses in one or more ofthe following forms, as selected by Lender: (aaa) cash; (bbb) money order; (ccc) certified check, bank check, treasurer's check, or cashier's check, provided any such check is drawn upon an institution whose deposits are insured by a U.S. federal agency, instrumentality, or entity; or (ddd) Electronic Fund Transfer. Upon Borrower's reinstatement of the Loan, this Security Instrument and obligations secured by this Security Instrument will remain fully effective as if no acceleration had occurred.

**21. Sale of Note.** The Note or a partial interest in the Note, together with this Security Instrument, may be sold or otherwise transferred one or more times. Upon such a sale or other transfer, all of Lender's rights and obligations under this Security Instrument will convey to Lender's successors and assigns.

**22. Loan Servicer.** Lender may take any action permitted under this Security Instrument through the Loan Servicer or another authorized representative, such as a sub-servicer. Borrower understands that the Loan Servicer or other authorized representative of Lender has the right and authority to take any such action.

The Loan Servicer may change one or more times during the term of the Note. The Loan Servicer may or may not be the holder of the Note. The Loan Servicer has the right and authority to: (a) collect Periodic Payments and any other amounts due under the Note and this Security Instrument; (b) perform any other mortgage loan servicing obligations; and (c) exercise any rights under the Note, this Security Instrument, and Applicable Law on behalf of Lender. If there is a change of the Loan Servicer, Borrower will be given written notice of the change which will state the name and address of the new Loan Servicer, the address to which payments should be made, and any other information RESPA requires in connection with a notice of transfer of servicing.

**23. Notice of Grievance.** Until Borrower or Lender has notified the other party (in accordance with Section 16) of an alleged breach and afforded the other party a reasonable period after the giving of such notice to take corrective action, neither Borrower nor Lender may commence, join, or be joined to any judicial action (either as an individual litigant or a member of a class) that (a) arises from the other party's actions pursuant to this Security Instrument or the Note, or (b) alleges that the other party has breached any provision of this Security Instrument or the Note. If Applicable Law provides a time period that must elapse before certain action can be taken, that time period will be deemed to be reasonable for purposes of this Section 23. The notice of Default given to Borrower pursuant to Section 26(a) and the notice of acceleration given to Borrower pursuant to Section 19 will be deemed to satisfy the notice and opportunity to take corrective action provisions of this Section 23.

**24. Hazardous Substances.**

**(a) Definitions.** As used in this Section 24: (i) "Environmental Law" means any Applicable Laws where the Property is located that relate to health, safety, or environmental protection; (ii) "Hazardous Substances" include (A) those substances defined as toxic or hazardous substances, pollutants, or wastes by Environmental Law, and (B) the following substances: gasoline, kerosene, other flammable or toxic petroleum products, toxic pesticides and herbicides, volatile solvents, materials containing asbestos or formaldehyde, corrosive materials or agents, and radioactive materials; (iii) "Environmental Cleanup" includes any response action, remedial action, or removal action, as defined in Environmental Law; and (iv) an "Environmental Condition" means a condition that can cause, contribute to, or otherwise trigger an Environmental Cleanup.

**(b) Restrictions on Use of Hazardous Substances.** Borrower will not cause or permit the presence, use, disposal, storage, or release of any Hazardous Substances, or threaten to release any Hazardous Substances, on or in the Property. Borrower will not do, nor allow anyone else to do, anything affecting the Property that: (i) violates Environmental Law; (ii) creates an Environmental Condition; or (iii) due to the presence, use, or release of a Hazardous Substance, creates a condition that adversely affects or could adversely affect the value of the Property. The preceding two sentences will not apply to the presence, use, or storage on the Property of small quantities of Hazardous Substances that are generally recognized to be appropriate to normal residential uses and to maintenance of the Property (including, but not limited to, hazardous substances in consumer products).

**(c) Notices; Remedial Actions.** Borrower will promptly give Lender written notice of: (i) any investigation, claim, demand, lawsuit, or other action by any governmental or regulatory agency or private party involving the Property and any Hazardous Substance or Environmental Law of which Borrower has actual knowledge; (ii) any Environmental Condition, including but not limited to, any spilling, leaking, discharge, release, or threat of release of any Hazardous Substance; and (iii) any condition caused by the presence, use, or release of a Hazardous Substance that adversely affects the value of the Property. If Borrower learns, or is notified by any governmental or regulatory authority or any private party, that any removal or other remediation of any Hazardous Substance affecting the Property is necessary, Borrower will promptly take all necessary remedial actions in accordance with Environmental Law. Nothing in this Security Instrument will create any obligation on Lender for an Environmental Cleanup.

**25. Electronic Note Signed with Borrower's Electronic Signature.** If the Note evidencing the debt for this Loan is electronic, Borrower acknowledges and represents to Lender that Borrower: (a) expressly consented and intended to sign the electronic Note using an Electronic Signature adopted by Borrower ("Borrower's Electronic Signature") instead of signing a paper Note with Borrower's written pen and ink signature; (b) did not withdraw Borrower's express consent to sign the electronic Note using Borrower's Electronic Signature; (c) understood that by signing the electronic Note using Borrower's Electronic Signature, Borrower promised to pay the debt evidenced by the electronic Note in accordance with its terms; and (d) signed the electronic Note with Borrower's Electronic Signature with the intent and understanding that by doing so, Borrower promised to pay the debt evidenced by the electronic Note in accordance with its terms.

**NON-UNIFORM COVENANTS.** Borrower and Lender further covenant and agree as follows:

**26. Acceleration; Remedies.**

**(a) Notice of Default.** Lender will give a notice of Default to Borrower prior to acceleration following Borrower's Default, except that such notice of Default will not be sent when Lender exercises its right under Section 19 unless Applicable Law provides otherwise. The notice will specify, in addition to any other information required by Applicable Law: (i) the Default; (ii) the action required to cure the Default; (iii) a date, not less than 30 days (or as otherwise specified by Applicable Law) from the date the notice is given to Borrower, by which the Default must be cured; (iv) that failure to cure the Default on or before the date specified in the notice may result in acceleration of the sums secured by this Security Instrument and sale of the Property; (v) Borrower's right to reinstate after acceleration; and (vi) Borrower's right to bring a court action to deny the existence of a Default or to assert any other defense of Borrower to acceleration and sale.

**(b) Acceleration; Power of Sale; Expenses.** If the Default is not cured on or before the date specified in the notice, Lender may require immediate payment in full of all sums secured by this Security Instrument without further demand and may invoke the power of sale and any other remedies permitted by Applicable Law. Lender will be entitled to collect all expenses incurred in pursuing the remedies provided in this Section 26, including, but not limited to: (i) reasonable attorneys' fees and costs; (ii) property inspection and valuation fees; and (iii) other fees incurred to protect Lender's interest in the Property and/or rights under this Security Instrument.

**(c) Notice of Sale; Sale of Property.** If Lender invokes the power of sale, Lender will execute or cause Trustee to execute a written notice of the occurrence of an event of Default and of Lender's election to cause the Property to be sold. Trustee will cause this notice to be recorded in each county in which any part of the Property is located.

Lender or Trustee will mail copies of the notice as prescribed by Applicable Law to Borrower and to the other required recipients. Trustee will give public notice of sale to the persons and in the manner prescribed by Applicable Law. At a time permitted by, and in accordance with Applicable Law, Trustee, without further demand on Borrower, will sell the Property at public auction to the highest bidder at the time and place and under the terms designated in the notice of sale in one or more parcels and in any order Trustee determines. Unless prohibited by Applicable Law, Trustee may postpone sale of all or any parcel of the Property by public announcement at the time and place of any previously scheduled sale. Lender or its designee may purchase the Property at any sale.

**(d) Trustee's Deed; Proceeds of Sale.** Trustee will deliver to the purchaser a Trustee's deed conveying the Property without any covenant or warranty, expressed or implied. The recitals in the Trustee's deed will be prima facie or conclusive evidence of the truth of the statements made in that deed, in accordance with Section 2924(c) of the Civil Code of California. Trustee will apply the proceeds of the sale in the following order: (i) to all expenses of the sale, including, but not limited to, reasonable Trustee's and attorneys' fees; (ii) to all sums secured by this Security Instrument; and (iii) any excess to the person or persons legally entitled to it.

**27. Reconveyance.** Upon payment of all sums secured by this Security Instrument, Lender will request Trustee to reconvey the Property and will surrender this Security Instrument and all Notes evidencing the debt secured by this Security Instrument to Trustee. Upon such request, Trustee will reconvey the Property without warranty to the person or persons legally entitled to it. Lender may charge such person or persons a reasonable fee for reconveying the Property, but only if the fee is paid to a third party (such as the Trustee) for services rendered and the charging of the fee is permitted under Applicable Law. If the fee charged does not exceed the fee set by Applicable Law, the fee is conclusively presumed to be reasonable.

**28. Substitute Trustee.** Lender may, from time to time appoint a successor trustee to any Trustee appointed under this Security Instrument by an instrument executed and acknowledged by Lender and recorded in the office of the Recorder of the county in which the Property is located. The instrument will contain the name of the original Lender, Trustee, and Borrower, the instrument number or the book and page where this Security Instrument is recorded and the name and address of the successor trustee. Without conveyance of the Property, the successor trustee will succeed to all the rights, title, power, and duties conferred upon Trustee in this Security Instrument and by Applicable Law. This procedure for substitution of trustee will govern to the exclusion of all other provisions for substitution.

**29. Statement of Obligation Fee.** Lender may collect a fee not to exceed the maximum amount permitted by Applicable Law for furnishing the statement of obligation as provided by Section 2943 of the Civil Code of California.

BY SIGNING BELOW, Borrower accepts and agrees to the terms and covenants contained in this Security Instrument and in any Rider signed by Borrower and recorded with it.

The undersigned Borrower requests that a copy of any Notice of Default and any Notice of Sale under this Security Instrument be mailed to Borrower's Notice Address.

MIGHTY TITANS LLC, A CALIFORNIA LIMITED LIABILITY COMPANY

By: [signature] 10/1/24
Borrower MICHAEL SCANNELL, MANAGING MEMBER Date

Witness

Witness

[Space Below This Line For Acknowledgment]

A notary public or other officer completing this certificate verifies only the identity of the individual who signed the document to which this certificate is attached, and not the truthfulness, accuracy, or validity of that document.

State of CALIFORNIA )

County of LOS ANGELES )

On 10-1-24 before me, Crystal Rejon, Notary Public
Date Here Insert Name and Title of the Notarizing Officer

personally appeared MICHAEL SCANNELL

Name(s) of Signer(s)

who proved to me on the basis of satisfactory evidence to be the person(s) whose name(s) is/are subscribed to the within instrument and acknowledged to me that he/she/they executed the same in his/her/their authorized capacity(ies), and that by his/her/their signature(s) on the instrument the person(s), or the entity upon behalf of which the person(s) acted, executed the instrument.

I certify under PENALTY OF PERJURY under the laws of the State of California that the foregoing paragraph is true and correct.

WITNESS my hand and official seal.

CRYSTAL REJON
Notary Public - California
San Bernardino County
Commission # 2362005
My Comm. Expires Jun 20, 2025

Notary Seal

Signature of Notary Public

Loan Originator: KENNETH ALAN RUBENDALL, NMLSR ID 321809
Loan Originator Organization: ALLSTATE LENDING GROUP, INC, NMLSR ID 272985

ORDER NO: SC 11074 BU

## ILLEGIBLE NOTARY SEAL DECLARATION

## GOVERNMENT CODE 27361.7

I CERTIFY UNDER PERJURY THAT THE NOTARY SEAL ON THE DOCUMENT TO WHICH THIS STATEMENT IS ATTACHED, READS AS FOLLOWS:

**NAME OF NOTARY:** CRYSTAL REJON

**DATE COMMISION EXPIRES:** JUNE 20,2025

**NOTARY IDENTIFICATION NUMBER:** 2362005
(FOR NOTARIES COMMISIONED AFTER 01/01/1992)

**MANUFACTURER / VENDOR IDENTIFICATION NUMBER:** _____
(FOR NOTARIES COMMISIONED AFTER 01/01/1992)

**COUNTY OF COMMISION:** SAN BERNARDINO

**PLACE OF EXECUTION OF THIS DECLARATION:** SAN BERNARDINO CALIFORNIA

**TODAYS DATE:** 10/02/2024

[signature]
SIGNATURE
To Cal Title Co

Loan Number: 24-10962

# 1-4 FAMILY RIDER

THIS 1-4 FAMILY RIDER is made this 30th day of September, 2024 , and is incorporated into and amends and supplements the Mortgage, Mortgage Deed, Deed of Trust, or Security Deed (the "Security Instrument") of the same date given by the undersigned (the "Borrower") to secure Borrower's Note to ALLSTATE LENDING GROUP, INC, A CALIFORNIA CORPORATION

(the "Lender") of the same date and covering the Property described in the Security Instrument and located at:

754 NORTH SWARTHMORE AVENUE, PACIFIC PALISADES, CALIFORNIA 90272

[Property Address]

**1-4 FAMILY COVENANTS.** In addition to the representations, warranties, covenants, and agreements made in the Security Instrument, Borrower and Lender further covenant and agree as follows:

**A. ADDITIONAL PROPERTY SUBJECT TO THE SECURITY INSTRUMENT.** In addition to the Property described in the Security Instrument, the following items now or later attached to the Property, to the extent they are fixtures, are added to the Property description, and will also constitute the Property covered by the Security Instrument: building materials, appliances and goods of every nature whatsoever now or later located in, on, or used, or intended to be used in connection with the Property, including, but not limited to, those for the purposes of supplying or distributing heating, cooling, electricity, gas, water, air and light, fire prevention and extinguishing apparatus, security and access control apparatus, plumbing, bath tubs, water heaters, water closets, sinks, ranges, stoves, refrigerators, dishwashers, disposals, washers, dryers, awnings, storm windows, storm doors, screens, blinds, shades, curtains and curtain rods, attached mirrors, cabinets, paneling, and attached floor coverings, all of which, including replacements and additions, will be deemed to be and remain a part of the Property covered by the Security Instrument. All of the foregoing together with the Property described in the Security Instrument (or the leasehold estate if the Security Instrument is on a leasehold) are referred to in this 1-4 Family Rider and the Security Instrument as the "Property."

**B. USE OF PROPERTY; COMPLIANCE WITH LAW.** Borrower will not seek, agree to, or make a change in the use of the Property or its zoning classification, unless Lender has agreed in writing to the change. Borrower will comply with all laws, ordinances, regulations, and requirements of any governmental body applicable to the Property.

**C. BORROWER'S OCCUPANCY.** Unless Lender and Borrower otherwise agree in writing, Section 6 concerning Borrower's occupancy of the Property is deleted.

**D. ASSIGNMENT OF LEASES.** Upon Lender's request after default, Borrower will assign to Lender all leases of the Property and all security deposits made in connection with leases of the Property. Upon the assignment, Lender will have the right to modify, extend, or terminate the existing leases and to execute new leases, in Lender's sole

discretion. As used in this paragraph D the word "lease" will mean "sublease" if the Security Instrument is on a leasehold.

**E. CROSS-DEFAULT PROVISION.** Borrower's default or breach under any note or agreement related to the Property in which Lender has an interest will be a breach under the Security Instrument and Lender may invoke any of the remedies permitted by the Security Instrument.

BY SIGNING BELOW, Borrower accepts and agrees to the terms and covenants contained in this 1-4 Family Rider.

MIGHTY TITANS LLC, A CALIFORNIA LIMITED LIABILITY COMPANY

By:________________________(Seal)
MICHAEL SCANNELL, -Borrower
MANAGING MEMBER

[Space Above This Line For Recording Data]

Loan Number: 24-10962

# BALLOON RIDER

THIS BALLOON RIDER is made this 30th day of September 2024, and is incorporated into and shall be deemed to amend and supplement the Mortgage, Deed of Trust or Security Deed (the "Security Instrument") of the same date given by the undersigned ("Borrower") to secure Borrower's Note (the "Note") to ALLSTATE LENDING GROUP, INC, A CALIFORNIA CORPORATION
(the "Lender") of the same date and covering the property described in the Security Instrument and located at:

754 NORTH SWARTHMORE AVENUE, PACIFIC PALISADES, CALIFORNIA 90272
[Property Address]

The interest rate stated on the Note is called the "Note Rate." The date of the Note is called the "Note Date." I understand the Lender may transfer the Note, Security Instrument and this Rider. The Lender or anyone who takes the Note, the Security Instrument and this Rider by transfer and who is entitled to receive payments under the Note is called the "Note Holder."

**ADDITIONAL COVENANTS.** In addition to the covenants and agreements in the Security Instrument, Borrower and Lender further covenant and agree as follows (despite anything to the contrary contained in the Security Instrument or the Note):

**THIS LOAN IS PAYABLE IN FULL AT MATURITY. YOU MUST REPAY THE ENTIRE PRINCIPAL BALANCE OF THE LOAN AND UNPAID INTEREST THEN DUE. THE LENDER IS UNDER NO OBLIGATION TO REFINANCE THE LOAN AT THAT TIME. YOU WILL, THEREFORE, BE REQUIRED TO MAKE PAYMENT OUT OF OTHER ASSETS THAT YOU MAY OWN, OR YOU WILL HAVE TO FIND A LENDER, WHICH MAY BE THE LENDER YOU HAVE THIS LOAN WITH, WILLING TO LEND YOU THE MONEY. IF YOU REFINANCE THIS LOAN AT MATURITY, YOU MAY HAVE TO PAY SOME OR ALL OF THE CLOSING COSTS NORMALLY ASSOCIATED WITH A NEW LOAN EVEN IF YOU OBTAIN REFINANCING FROM THE SAME LENDER.**

BY SIGNING BELOW, Borrower accepts and agrees to the terms and covenants contained in this Balloon Rider.

MIGHTY TITANS LLC, A CALIFORNIA LIMITED LIABILITY COMPANY

By: ______________________________ (Seal)
MICHAEL SCANNELL, -Borrower
MANAGING MEMBER

# EXHIBIT C

This page is part of your document - DO NOT DISCARD

# 20240675691

Pages: 0005

Recorded/Filed in Official Records
Recorder's Office, Los Angeles County,
California

10/03/24 AT 08:00AM

| | |
|---|---|
| FEES: | 29.00 |
| TAXES: | 0.00 |
| OTHER: | 0.00 |
| PAID: | 29.00 |

LEADSHEET

202410030160003

00024847656

014925123

SEQ:
03

SECURE - 8:00AM

THIS FORM IS NOT TO BE DUPLICATED

SC-11074 BU

RECORDING REQUESTED BY
SO CAL TITLE COMPANY
AND WHEN RECORDED MAIL DOCUMENT TO:

NAME ALLSTATE LENDING GROUP
STREET ADDRESS 2540 CORPORATE PLACE # B108
CITY, STATE & ZIP CODE MONTEREY PARK CA 91754

SPACE ABOVE FOR RECORDER'S USE ONLY

# ASSIGNMENT OF DEED OF TRUST

Title of Document

Pursuant to Senate Bill 2 – Building Homes and Jobs Act (GC Code Section 27388.1), effective January 1, 2018, a fee of seventy-five dollars ($75.00) shall be paid at the time of recording of every real estate instrument, paper, or notice required or permitted by law to be recorded, except those expressly exempted from payment of recording fees, per each single transaction per parcel of real property. The fee imposed by this section shall not exceed two hundred twenty-five dollars ($225.00).

☐ Exempt from fee per GC 27388.1 (a) (2); recorded concurrently "in connection with" a transfer subject to the imposition of documentary transfer tax (DTT).

☐ Exempt from fee per GC 27388.1 (a) (2); recorded concurrently "in connection with" a transfer of real property that is a residential dwelling to an owner-occupier.

☒ Exempt from fee per GC 27388.1 (a) (1); fee cap of $225.00 reached.

☐ Exempt from the fee per GC 27388.1 (a) (1); not related to real property.

THIS COVER SHEET ADDED TO PROVIDE ADEQUATE SPACE FOR RECORDING INFORMATION
($3.00 Additional Recording Fee Applies)

Recording requested by

**ACCOMMODATION**

Recording Requested By:
ALLSTATE LENDING GROUP, INC

And After Recording Return To:
ALLSTATE LENDING GROUP,
INC
2540 CORPORATE PLACE STE B108
MONTEREY PARK, CALIFORNIA 91754
Loan Number: 24-10962

APN 4412-009-033

[Space Above This Line For Recording Data]

# ASSIGNMENT OF DEED OF TRUST

Loan Number: 24-10962

FOR VALUE RECEIVED, the undersigned hereby grants, assigns and transfers to

TRMY INC, A WYOMING CORPORATION, AS TO AN UNDIVIDED 15% INTEREST AND JORDAN ROSEN, A SINGLE MAN, AS TO AN UNDIVIDED 5% INTEREST AND ALISA ABECASSIS, TRUSTEE OF THE ALISA ABECASSIS REVOCABLE TRUST DATED APRIL 14TH, 2004, AS TO AN UNDIVIDED 5% INTEREST AND C FAMILY INVESTMENTS LLC, AS TO AN UNDIVIDED 22.75% INTEREST AND MICHAEL C. VERNICK, AS TRUSTEE OF THE MCV INVESTMENTS DEFINED BENEFIT PLAN, AS TO AN UNDIVIDED 10.5% INTEREST AND MICHAEL L. VERNICK AND LINDA R. VERNICK, TRUSTEES OF THE VERNICK FAMILY TRUST U/A DECEMBER 29, 1983, AS TO AN UNDIVIDED 4.25% INTEREST AND TOOTALL LLC, AS TO AN UNDIVIDED 12.5% INTEREST AND SILVINA VACCARO, AN UNMARRIED WOMAN, AS TO AN UNDIVIDED 12.5% INTEREST AND RAPTOR INDUSTIRES INC, AS TO AN UNDIVIDED 12.5% INTEREST

all beneficial interest under that certain Deed of Trust dated September 30, 2024
executed by MIGHTY TITANS LLC, A CALIFORNIA LIMITED LIABILITY COMPANY, 2540 CORPORATE PLACE SUITE B108, MONTEREY PARK, CALIFORNIA 91754

, Trustor,

to ALLSTATE LENDING GROUP SERVICING LLC
2540 CORPORATE PLACE, SUITE B108, MONTEREY PARK, CALIFORNIA 91754

, Trustee,

and recorded either:

☑ concurrently herewith; or

☐ on , as Instrument No. in book , page , in the Official Records in the County Recorder's office of LOS ANGELES County, CALIFORNIA , describing land therein as:

LOT 18, IN BLOCK 30, OF TRACT NO. 8300, IN THE CITY OF LOS ANGELES, COUNTY OF LOS ANGELES, STATE OF CALIFORNIA, AS PER MAP RECORDED IN BOOK 125, PAGES 55 THROUGH 78 INCLUSIVE OF MAPS, IN THE OFFICE OF THE COUNTY RECORDER OF SAID COUNTY.
EXCEPTING THEREFROM ALL MINERALS, OIL, GAS AND RELATED SUBSTANCES LYING BELOW A DEPTH OF 500 FEET OF THE SURFACE OF THE DESCRIBED REAL PROPERTY BUT WITHOUT RIGHT OF SURFACE ENTRY UPON SAID REAL PROPERTY, AS GRANTED IN DEED RECORDED OCTOBER 6, 1967 AS INSTRUMENT NO. 67-1596923, OFFICIAL RECORDS.
A.P.N.: 4412-009-033

TOGETHER with the note or notes therein described or referred to, the money due and to become due thereon with interest, and all rights accrued or to accrue under said Deed of Trust. The original principal amount due under this note(s) is $ 2,000,000.00 .

ALLSTATE LENDING GROUP, INC. A
CALIFORNIA CORPORATION

By: [signature] (Seal)
MICHAEL G. SCANNELL, CEO

[Space Below This Line For Acknowledgments]

A notary public or other officer completing this certificate verifies only the identity of the individual who signed the document to which this certificate is attached, and not the truthfulness, accuracy, or validity of that document.

State of CALIFORNIA )

County of LOS ANGELES )

On 10-1-24 before me, Crystal Rejon, Notary Public

personally appeared MICHAEL G. SCANNELL

who proved to me on the basis of satisfactory evidence to be the person(s) whose name(s) is/are subscribed to the within Instrument and acknowledged to me that he/she/they executed the same in his/her/their authorized capacity(ies), and that by his/her/their signature(s) on the instrument the person(s), or the entity upon behalf of which the person(s) acted, executed the instrument.

I certify under PENALTY OF PERJURY under the laws of the State of California that the foregoing paragraph is true and correct.

WITNESS my hand and official seal.

CRYSTAL REJON
Notary Public - California
San Bernardino County
Commission # 2362005
My Comm. Expires Jun 20, 2025

NOTARY SEAL

[signature]
NOTARY SIGNATURE

Crystal Rejon
(Typed Name of Notary)

ORDER NO: SC 11074 BU

## ILLEGIBLE NOTARY SEAL DECLARATION

## GOVERNMENT CODE 27361.7

I CERTIFY UNDER PERJURY THAT THE NOTARY SEAL ON THE DOCUMENT TO WHICH THIS STATEMENT IS ATTACHED, READS AS FOLLOWS:

NAME OF NOTARY: CRYSTAL REJON

DATE COMMISION EXPIRES: JUNE 20,2025

NOTARY IDENTIFICATION NUMBER: 2362005
(FOR NOTARIES COMMISIONED AFTER 01/01/1992)

MANUFACTURER / VENDOR IDENTIFICATION NUMBER: _____
(FOR NOTARIES COMMISIONED AFTER 01/01/1992)

COUNTY OF COMMISION: SAN BERNARDINO

PLACE OF EXECUTION OF THIS DECLARATION: SAN BERNARDINO CALIFORNIA

TODAYS DATE: 10/02/2024

SIGNATURE

So Cal Title Co.

**B1040 (FORM 1040) (12/15)**

| **ADVERSARY PROCEEDING COVER SHEET**<br>(Instructions on Reverse) | **ADVERSARY PROCEEDING NUMBER**<br>(Court Use Only) |
|---|---|
| **PLAINTIFFS**<br>MIGHTY TITANS LLC,<br>a California limited liability company | **DEFENDANTS** ALLSTATE LENDING GROUP, INC., a California corporation; ALLSTATE LENDING GROUP SERVICING, LLC, a California limited liability company, et al. |
| **ATTORNEYS** (Firm Name, Address, and Telephone No.)<br>JEFFER MANGELS & MITCHELL LLP<br>THOMAS M. GEHER (Bar No. 130588)<br>1900 Avenue of the Stars, 7th Floor<br>Los Angeles, CA 90067 Tel: (310) 203-8080 | **ATTORNEYS** (If Known)<br>RAINES FELDMAN LITTRELL LLP<br>KYRA E. ANDRASSY (Bar No. 207959)<br>4675 MacArthur Court, Suite 1550<br>Newport Beach, CA 92660 Tel: (310) 440-4100 |
| **PARTY** (Check One Box Only)<br>☐ Debtor ☐ U.S. Trustee/Bankruptcy Admin<br>☒ Creditor ☐ Other<br>☐ Trustee | PARTY (Check One Box Only)<br>☒ Debtor ☐ U.S. Trustee/Bankruptcy Admin<br>☐ Creditor ☐ Other<br>☐ Trustee |

**CAUSE OF ACTION** (WRITE A BRIEF STATEMENT OF CAUSE OF ACTION, INCLUDING ALL U.S. STATUTES INVOLVED)

This is a Matter for Quiet Title; Cancellation of Instruments; Declaratory Relief; Accounting; and Slander of Title, due to a fraudulent loan and deeds of trust.

**NATURE OF SUIT**

(Number up to five (5) boxes starting with lead cause of action as 1, first alternative cause as 2, second alternative cause as 3, etc.)

**FRBP 7001(1) – Recovery of Money/Property**
- ☐ 11-Recovery of money/property - §542 turnover of property
- ☐ 12-Recovery of money/property - §547 preference
- ☐ 13-Recovery of money/property - §548 fraudulent transfer
- ☐ 14-Recovery of money/property - other

**FRBP 7001(2) – Validity, Priority or Extent of Lien**
- ☒ 21-Validity, priority or extent of lien or other interest in property

**FRBP 7001(3) – Approval of Sale of Property**
- ☐ 31-Approval of sale of property of estate and of a co-owner - §363(h)

**FRBP 7001(4) – Objection/Revocation of Discharge**
- ☐ 41-Objection / revocation of discharge - §727(c),(d),(e)

**FRBP 7001(5) – Revocation of Confirmation**
- ☐ 51-Revocation of confirmation

**FRBP 7001(6) – Dischargeability**
- ☐ 66-Dischargeability - §523(a)(1),(14),(14A) priority tax claims
- ☐ 62-Dischargeability - §523(a)(2), false pretenses, false representation, actual fraud
- ☐ 67-Dischargeability - §523(a)(4), fraud as fiduciary, embezzlement, larceny

**(continued next column)**

**FRBP 7001(6) – Dischargeability (continued)**
- ☐ 61-Dischargeability - §523(a)(5), domestic support
- ☐ 68-Dischargeability - §523(a)(6), willful and malicious injury
- ☐ 63-Dischargeability - §523(a)(8), student loan
- ☐ 64-Dischargeability - §523(a)(15), divorce or separation obligation (other than domestic support)
- ☐ 65-Dischargeability - other

**FRBP 7001(7) – Injunctive Relief**
- ☐ 71-Injunctive relief – imposition of stay
- ☐ 72-Injunctive relief – other

**FRBP 7001(8) Subordination of Claim or Interest**
- ☐ 81-Subordination of claim or interest

**FRBP 7001(9) Declaratory Judgment**
- ☒ 91-Declaratory judgment

**FRBP 7001(10) Determination of Removed Action**
- ☐ 01-Determination of removed claim or cause

**Other**
- ☐ SS-SIPA Case – 15 U.S.C. §§78aaa *et.seq.*
- ☒ 02-Other (e.g. other actions that would have been brought in state court if unrelated to bankruptcy case)

| | |
|---|---|
| ☒ Check if this case involves a substantive issue of state law | ☐ Check if this is asserted to be a class action under FRCP 23 |
| ☐ Check if a jury trial is demanded in complaint | Demand $ |

Other Relief Sought

**B1040 (FORM 1040) (12/15)**

| **BANKRUPTCY CASE IN WHICH THIS ADVERSARY PROCEEDING ARISES** | | |
|---|---|---|
| NAME OF DEBTOR<br>ALLSTATE LENDING GROUP, INC., *et al.* | BANKRUPTCY CASE NO.<br>2:26-bk-11879- NB | |
| DISTRICT IN WHICH CASE IS PENDING<br>CENTRAL | DIVISION OFFICE<br>LOS ANGELES | NAME OF JUDGE<br>Honorable Neil W. Bason |
| **RELATED ADVERSARY PROCEEDING (IF ANY)** | | |
| PLAINTIFF | DEFENDANT | ADVERSARY PROCEEDING NO. |
| DISTRICT IN WHICH ADVERSARY IS PENDING | DIVISION OFFICE | NAME OF JUDGE |
| SIGNATURE OF ATTORNEY (OR PLAINTIFF)<br> | | |
| DATE<br>August 18, 2026 | PRINT NAME OF ATTORNEY (OR PLAINTIFF)<br>Thomas M. Geher | |

## INSTRUCTIONS

The filing of a bankruptcy case creates an "estate" under the jurisdiction of the bankruptcy court which consists of all of the property of the debtor, wherever that property is located. Because the bankruptcy estate is so extensive and the jurisdiction of the court so broad, there may be lawsuits over the property or property rights of the estate. There also may be lawsuits concerning the debtor's discharge. If such a lawsuit is filed in a bankruptcy court, it is called an adversary proceeding.

A party filing an adversary proceeding must also must complete and file Form 1040, the Adversary Proceeding Cover Sheet, unless the party files the adversary proceeding electronically through the court's Case Management/Electronic Case Filing system (CM/ECF). (CM/ECF captures the information on Form 1040 as part of the filing process.) When completed, the cover sheet summarizes basic information on the adversary proceeding. The clerk of court needs the information to process the adversary proceeding and prepare required statistical reports on court activity.

The cover sheet and the information contained on it do not replace or supplement the filing and service of pleadings or other papers as required by law, the Bankruptcy Rules, or the local rules of court. The cover sheet, which is largely self-explanatory, must be completed by the plaintiff's attorney (or by the plaintiff if the plaintiff is not represented by an attorney). A separate cover sheet must be submitted to the clerk for each complaint filed.

**Plaintiffs** and **Defendants.** Give the names of the plaintiffs and defendants exactly as they appear on the complaint.

**Attorneys.** Give the names and addresses of the attorneys, if known.

**Party**. Check the most appropriate box in the first column for the plaintiffs and the second column for the defendants.

**Demand.** Enter the dollar amount being demanded in the complaint.

**Signature.** This cover sheet must be signed by the attorney of record in the box on the second page of the form. If the plaintiff is represented by a law firm, a member of the firm must sign. If the plaintiff is pro se, that is, not represented by an attorney, the plaintiff must sign.